State v. Palmer.

# THE STATE v. PALMER, Appellant.

### Division Two, March 12, 1901.

1. **Appellate Practice:** APPLICATION FOR CONTINUANCE: OMITTED FROM BILL OF EXCEPTIONS. Denial of an applicatioin for a continuance can not be considered if not embodied in the bill of exceptions, notwithstanding the record recites that on the denial defendant excepted.

2. **Murder:** DEFENSE OF IMBECILITY: INSTRUCTION. In a prosecution for murder, defended on the ground of imbecility, the jury were properly instructed that mere weakness of intellect will not shield one who commits a crime, and that, though defendant was mentally deficient in some degree, yet they should convict him unless they were reasonably satisfied that at the time of committing the act his mental faculties were so weak that he was unconscious that it was wrong, and had not the mental capacity to choose between right and wrong.

3. ———: ———: ———: PRESUMPTION OF SANITY. They were also properly instructed that every man is presumed to be sane till the contrary is proved, and, where mental imbecility is interposed as a defense, defendant must prove it to their reasonable satisfaction, and that it must be proved that at the time of committing the act defendant labored under such mental defects as not to know the nature of the act he was doing, or, if he did know it, that he did not know that he was doing wrong.

4. ———: ———: LUCID INTERVAL: BURDEN OF PROOF. In a prosecution for murder, defended on the ground of defendant's imbecility, the burden is not on the State to show, as in the case of a proved chronic state of insanity, a lucid interval at the time of the killing.

5. **Practice:** FAILURE TO INSTRUCT: NO OBJECTION AT TRIAL. An objection to a failure to instruct on all questions in the case can not be raised for the first time on appeal.

State v. Palmer.

6. **Hypothetical Question:** NOT BASED ON EVIDENCE. A hypothetical question based on a statement of facts of which there was no evidence in the case should have been excluded.

7. **Testimony of Expert:** OPINION AS TO DEFENDANT'S SANITY. An expert testifying for the defense, never having had an opportunity to examine the accused, can not express his opinion whether, at the time of the homicide, he was capable of deliberating like a sane person.

8. ————: INCOMPETENT TESTIMONY: NO GROUND FOR COMPLAINT. The defense, having been allowed to ask wholly incompetent questions of experts as to the condition of defendant's mind on the day of the homicide, can not complain of error in permitting the State to pursue a similar course.

9. **Verdict:** CAN NOT BE IMPEACHED BY JURORS. The rule that jurors will not be allowed to impeach their verdict by statements or affidavits is inflexible.

Appeal from Callaway Circuit Court.—*Hon. John A. Hockaday*, Judge.

AFFIRMED.

*E. L. McCall* for appellant.

(1) The court erred in not more fully instructing the jury on the law as applicable to the case, according to the evidence, and the jury could not fully comprehend defendant's mental responsibility, as shown by the instructions in the case. The defendant established an habitual chronic state of insanity, extending all through his life, and the burden of proof was on the State, to show a lucid interval, at the time of the killing. State v. Lowe, 95 Mo. 547; McLeod v. State (Tex.), 20 S. W. 794; State v. Klinger, 43 Mo. 127; Chamb. Best on Evidence, sec. 405. (2) The verdict is so contrary to the evidence that it must be ascribed to prejudice on the part of the jury. As shown by affidavit, the jury stated that they must be governed

by public sentiment in the case, admitting that defendant was not responsible at the time, as shown by the evidence, but that they had to do something with him.    State v. Castor, 93 Mo. 242; State v. Jaeger, 66 Mo. 173.    (3) If the defendant introduced sufficient evidence to raise a reasonable doubt as to his sanity at the time, then the State must prove a lucid interval, as any other fact.    People v. McCann, 16 N. Y. 53; Davis v. United States, 16 S. C. Rep. 353; Hopps v. People, 31 Ill. 358; Walker v. People, 88 N. Y. 81.    And the court should have so instructed the jury.    (4) The testimony introduced by the prosecution in rebuttal, did attempt directly and by circumstances, to contradict the insanity history of defendant, but utterly failed, leaving the fact disproved on the record, that defendant is almost an idiot, and could not, at the time, of the offense have been responsible for the act, taking into consideration all of the facts at the time of the offense.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) Defendant insists that he established an habitual chronic state of insanity, extending all through his life.    This we deny.    It was for the jury to so determine and sufficient instructions were given in that respect.    The defendant being presumed to be sane, it devolved upon him to show insanity, and if it should have been admitted upon the part of the State that the defendant was at times insane and at times sane, then it would be proper for the court to require the State to prove that the act was committed at a time when the defendant was in possession of all his faculties.    But this is not the case.    The State maintains and stands upon the usual presumption of defendant's sanity, so that it becomes the duty of the defendant to show that he was either insane at the time the act was committed, or that he was an idiot or imbecile and unable to per·

form a purpose.to kill or to deliberate upon the commission of the act.    The authorities submitted by the defendant upon this proposition are not in point.    Insanity, to constitute a valid defense to a criminal charge, is such only as renders a defendant incapable of knowing the right from the wrong of the particular act which is the subject of the charge.    State v. Baldwin, 12 Mo. 223 ; State v. Erb, 74 Mo. 199 ; State v. Katovsky, 74 Mo. 247 ; State v. Lowe, 93 Mo. 557.    (2)  No objection could be made to the instruction given by the court on the question of murder in the first degree, as the defendant was convicted of murder in the second degree.    But, aside from that feature of the case, the trial court is shown to have properly instructed the jury upon murder in all the degrees and, at the defendant's request, upon manslaughter.    (3)    There is no evidence of any bias or prejudice on the part of the jury.  State v. Lowe, 93 Mo. 547.    Defendant was given a fair and impartial trial, and the verdict of the jury should stand.    While it is true he was not possessed of a strong mind, yet there is no question from the testimony that he was capable of distinguishing the difference between right and wrong and knew what it was to preserve life and good order.    (4)  The jury found, from all the evidence introduced on the question of idiocy or imbecility, that he was of sane mind and capable of distinguishing between right and wrong, and responsible for his acts, and that he committed the homicide under such circumstances as to constitute murder in the second degree.

SHERWOOD, P. J.—This prosecution was instituted in Callaway county, because defendant, 20 years old, on the twenty-third day of April, 1899, at his mother's house in Fulton, shot and killed Thomas Gannaway, aged about 19 years, with a revolver.    There were two mortal wounds inflicted by the shooting; one on the right side of the windpipe, the neck being

powder-burned by the discharge; the other on the left shoulder blade, the padding of the coat being set afire; and Dr. Gordon who testified to these facts, stated that the pistol that made the wounds could only have been a few feet away at the time of their making.

An indictment for murder in the first degree was returned by the grand jury on the tenth of May next following the homicidal act, and on trial defendant was found guilty of murder in the second degree, punishment being assessed at ten years in the penitentiary; hence this appeal.

The first question to be determined is the one relative to the denial of defendant's application for a continuance, which was sworn to by defendant.

The denial of this application can not be considered, because not embodied in the bill of exceptions. [State v. Griffin, 98 Mo. 672, and subsequent cases.] And although the record recites that on the denial of his application defendant excepted, yet this recital cuts no figure, because matters of exception, such as this, can only be preserved in a bill of exceptions, the sole repository known to the law for the preservation of such matters. [State v. Wear, 145 Mo. loc. cit. 204, 205 and cas. cit.] The recital by the clerk in the record has no such preservative power. [Ib.]

This brings into view the merits of the cause. The plea of not guilty was entered in usual form, and in its support testimony was introduced tending to show such a degree of imbecility of mind on part of defendant as rendered him irresponsible for the act done, and there was testimony of a contrary effect. And on this question of imbecility of the sort mentioned, the decision of this cause hinges and turns. Testimony on this subject was introduced, both pro and con. Charles Mortz testified as follows: I reside in Fulton. I am twenty-two years old. I knew Thomas Gannaway in his life-

time; knew him for a long time. I remember walking down to Mrs. Palmer's house on the twenty-third day of April, 1899, with Perley Blunt, Tom Gannaway and True Byers; it was about one o'clock or a little after. We boys were up town together and Tom Gannaway said, "Let's go down this way." He wanted to go to see his girl he said, and I said I would go with him; he said he wanted to introduce her to me. All of us boys went down there together and me and Gannaway stopped in and the other boys went on and we told them to come on and go in, but they said, "No, they would go on." We stopped there then and Gannaway went up to the door and rang the bell and nobody answered and he rang it again and nobody answered; then he said to me, "Come on," and he opened the door and we went in together. When we went in I saw —— Pierson, —— Hudgens and Ed. Palmer there in the room. We went in the west room, the front room. The house is right on the sidewalk. Gannaway went in first and said, "Good evening," but I don't know whether anybody said "Good evening" to him or not. That defendant, just after Mortz and Gannaway came into the room, went towards a cupboard that stood by the door leading into the dining room. Gannaway then said, "I want to see Mrs. Palmer," and the boys were sitting there and they had their heads down, and Gannaway started to the door and Ed. Palmer got up and said, "I will see that you don't go in there." I was standing and turned around and touched Gannaway on the arm and said, "We are not welcome, Crup, let's us got out." When I touched him on the arm and said "we are not welcome," he said, "Wait a minute," and I turned and went out. I heard two shots fired. I was about in the middle of the street when the first one was fired. I didn't turn back. I was not very far when the second shot was fired. I did not see Gannaway any more until after he was shot. He was then in the mayor's office.

E. G. Pierson testified: I knew Tom Gannaway during his life; had known him sometime before he was killed. I remember seeing him on the twenty-third day of April, 1899. I saw him that time about nine o'clock in the morning and was with him until about noon. We ate dinner together. After dinner we went down the street and I left him at the corner near Carter's saloon. I went to Mrs. Palmer's. When I got there I found Cal. Hudgens and Ed. Palmer there. It was only a few minutes until Tom Gannaway came in. I heard him knock at the door. He knocked three times, I think, and some one said, "Come in" as he stepped in the room. Charlie Mortz was with him. Gannaway asked where Mrs. Palmer was and some one said she was in the kitchen, and he said, "I want to see her a minute or two." Ed. Palmer says, "I will see whether you see her or not," and as he said that he got up and went to the press which was near the middle door and opened it and I thought he took something out of it. I can not say what he did with it. Gannaway then said, "Why didn't you ask me like a gentleman not to go in there and I would not have started?" And then Palmer pulled out a pistol and shot him. Palmer was standing in front of the middle door, and Gannaway was standing a little in front of him; they were facing each other. When the first shot was fired, Gannaway grabbed me around the neck, and Palmer kept on shooting him and I came up and held him and Gannaway grabbed hold of me and swung me around in front of him and I swung back and Palmer shot again. I think the second shot hit him and the third shot missed. Then Gannaway let go of me and got away. I do not know what Palmer did after he fired the shots. I went out where Gannaway was in the street as soon as I could. He was lying in front of Dr. Dories' house, on the ground. He was not dead when I got there, but didn't live more than a minute and a half. I heard him say, "Ed. Palmer shot me and he

shot me for nothing." When I first saw Gannaway after he was shot, the blood was coming from his mouth, and there was some on his shirt collar, and his coat was still afire on the back.

Another witness also testified that some one said "Come in" as Tom Gannaway knocked at the door.

M. S. Roberts testified as follows:   On the twenty-third day of last April, I was living on Fourth street, east of Market street in Fulton.   I knew Mrs. Palmer, the mother of defendant at the time.   She was living on the south side of Fourth street, right opposite the house I was living in.   I was at home on that day.   About one o'clock or a few minutes past one, while I was in the yard, I heard three shots fired pretty close together.   I went in the house, through the school room, and then through the hall to the front door, and when I got to the front door, I saw Tom Gannaway coming out from the east side of the Palmer house, and he came to the gate at the east corner which comes out on the street, and as he came out the gate, he stumbled and the blood was coming out of his mouth and nose and when he stumbled he threw up his head.   I was in the door then and he came across the street to me, and he said, "Bug, go for a doctor."   I said, "My God, Crup, what's the matter?"   He kept coming towards me and was about to fall and I started to him, but he fell before I got there.   He fell in about two feet of me.   He didn't live more than two and a half minutes after I got back from going up the street after a doctor.   I was not gone more than two or three minutes; when I got back he was lying just where he was when I left him.   He didn't live over four minutes, if that long, from the time he fell until he died.   There was one shot in the throat and the bullet went through the necktie and the collar. There was another wound under his left shoulder blade and his throat and chin were powder-burned.   The wadding of his coat was burned where the bullet went through.

Calvin Hudgens testified: I live in Fulton. I am the son of Tom Hudgens, the engineer at the waterworks. I am nineteen years old. I knew Tom Gannaway in his lifetime; I had known him a long time. I was not with him Sunday morning, April 23, 1899, the day he was killed. I saw him that day at Mrs. Palmer's, the mother of defendant. I know defendant; have known him about five or six years. I went to Mrs. Palmer's house about between twelve and one o'clock. Ed. Palmer and a blind man, named Tom Shepard were there. I went into the main room. Guy Pierson afterwards came in. The blind man did not leave when Guy came in but when Gannaway came in, he left the house. I was in the room when Tom Gannaway and Mortz came in. I didn't hear anybody say, "Come in" when they were at the door. After they came in the first thing Gannaway said was, "Good evening, gentlemen," and I spoke to him and then went to reading. Tom Gannaway then asked where Mrs. Palmer was, and Ed. said she was in the kitchen. Gannaway said something about he believed he would go in and see her, and then I heard a shuffling of feet and I looked up from my paper, and they were across the room, and Ed. was standing with his back to the dining room door and Gannaway was in front of him. I heard Ed. say, "I will see whether you go in or not," and Gannaway said, "If you had asked me like a gentleman, I never would have started." Then he said something low which I didn't understand. Then Palmer says, "I will see whether you go in there or not," and just as he said that, one shot went off. When the shot was fired I think they were not over two or three feet apart. Palmer was facing the northeast. Gannaway was facing the southwest. When the shot was fired, I looked up from my paper and saw them. Then Gannaway turned and started to go out of the room and Palmer followed him up and fired two shots. Gannaway went out of the back door and Palmer stood

still in the floor, and as Gannaway went out through the dining room door he whirled around and I took the revolver away from Palmer. I saw no weapons in Gannaway's hands. I didn't hear him make any threats. This occurred between twelve and one o'clock.

Herman Dories testified: I was living in Fulton on the twenty-third day of April last. I lived right across the street from Mrs. Palmer, the mother of the defendant. I was at home about one o'clock on the twenty-third day of April, 1899. I heard three pistol shots fired between five and ten minutes after one o'clock—sounded like they came from across the street. They were close together like as if you would pull one off and then another right away. When I heard the shots, I went to the front window, and I saw Tom Gannaway run out of the east gate of Mrs. Palmer's yard. At the gate when I first saw him he was running pretty fast, but after he struck the corner he got more and more into a walk and after he got across the street he fell in the street. I run out to him but he fell before I got there. I raised his head up and asked him who did the shooting, and he said, "Ed. Palmer shot me." I asked him what he was doing back there, and he said "Nothing" and I never asked him any more questions. I saw both the wounds after I turned him over, one at the shoulder and one at the neck. They were pistol shot wounds and the one on his neck was burned. He was bleeding at the mouth. He lived three or four minutes after he fell in the street.

J. W. Carner testified: I am constable of this township, and deputy sheriff of Callaway county. I live in Fulton. I do not remember the day of the month that Gannaway was killed, but it was on Sunday. When the shooting occurred I was near McCue & Grant's grocery store. I heard the shooting. I walked up this way (indicating) and met Mr. Roberts

running up the street to the telephone office and he told me of the shooting and I walked up there as soon as I could and found Mrs. Palmer out in the street and Mr. Dories and I think some other parties there with him.   Ed. Palmer was there.   He was standing out in the street.   Gannaway breathed once or twice after I got there.   Dories or Doctor Gordon one was holding his head up.   About the time Gannaway breathed his last I looked around and asked who did it and where he was at, and at that time I saw the defendant standing a few steps away. The defendant said in my presence that he had shot the deceased.   I walked around on the west side of Gannaway, and I saw Ed. Palmer standing to the southeast of where Gannaway was laying, and I walked around and took him by the arm and that's when he told me that he did the shooting.   I said, "What did you shoot him for?"   He said, "He didn't want Gannaway *in his house."*   I told him to come on and go with me, and he pulled back and his brother took hold of him, and about that time Mr. Buchanan came up and took hold of his brother, and I took the defendant to the mayor's office and stayed with him.

J. H. Buchanan testified:   I am sheriff of Callaway county; was sheriff on the twenty-third of last April.   I remember the occasion of Ed. Palmer shooting Tom Gannaway here in Fulton; that was on the twenty-third day of last April. I was at home.   It was about one o'clock, just after dinner. Defendant's mother lived around the corner in the same block where I live—not over one hundred and fifty yards away, I should think.   I heard two or three shots fired about one o'clock of that day.   I went out to see what was the trouble, and I saw the people running up that way, and I went up there, too, as quick as I could to see what had occurred.   I saw Mr. Gannaway lying out on the street over there in front of Mr. Dories' house, close to the north side of the street.   They were holding his head up and he was bleeding some from the mouth and

nose.   They told me he was shot.   He was alive when I got there, but he died afterwards; didn't live but a few minutes.   I know the defendant Ed. Palmer; saw him there that day.

Carner asked defendant where his pistol was that he did the shooting with, and defendant said it was at the house; then witness went to the house and asked Mrs. Palmer for it, and she handed it to him out of the cupboard or press.   Carner also stated that defendant was not at all excited; that he was laughing when he first saw him out there in the street; that you could not have told by his looks that defendant had done the shooting; "he looked more like he had done something smart, than that he had committed a crime."   Other witnesses also testified that defendant was not excited; that Gannaway's body was searched and no weapons found upon it, and that the two wounds inflicted on Gannaway's body were mortal.

In the above extracts are given the substance of the testimony on behalf of the State, omitting the testimony of some witnesses not important, and in this summary is included the main portions of the testimony of every witness present when the shooting occurred.

On part of defendant there was testimony introduced to the following substance and effect:   Sam Lee, an uncle by marriage of defendant, testified:   I reside about a mile and a half west of town.   I married Miss Landis.   I know Mrs. Palmer, the mother of the defendant; have known her since 1865. I know the defendant; have known him all his life.   I do not think his mental condition is good.   As to my opportunity of knowing his mental condition, I will state that I first knew him when he was three weeks old and his father left the place where he was living and where the boy was born and moved to Kansas.   I didn't see him after he moved away until he was about ten years old.   He moved to Kansas in 1878 and came back in 1888.   He stayed at my house three weeks after he

came back from Kansas. He was not like my boys. I had a boy about his age and he was not like him, or any other boy I ever saw. As long as he was at my place he had to be watched. We told the other boys to watch him and see that he didn't go where he would be hurt. He didn't have knowledge enough to know when he was in danger. He was about ten years old then. I knew his brother Louis. I think he was about three years old when his father went to Kansas; I didn't see him any more until he came back. Louis didn't know enough or have get-up enough about him to go anywhere or do anything. I had no opportunity of observing the mental condition of Mrs. Palmer except being in the family. I do not think her mental condition is good. In my judgment it is not. She has no learning and would never take any; that's what I understood from her folks. I didn't know her at that time. She was about twenty years old when I first got acquainted with her. I think she is a weak woman, never was very strong. So far as judgment is concerned she has no judgment about anything, but can remember very well for a person of that kind. I knew defendant's father. I would not consider him hardly an average man.

Sam Lee, Jr., testified: I live about a mile and a half west of town. I knew the defendant, he is not very bright. I have known him about ten years. I have seen him often and been with him often. From my conversations with him and from my general knowledge of him and his mental condition, I will say that he is not able to take care of himself. He has not good sense. I always had to watch him when I was with him. I was not with him on the twenty-third of last April. I know his mother, and have talked with her; have known her about ten or eleven years. She can remember things but she don't know half the time what she is talking about. She was about like Ed., I think. I can not see much difference between

the two. I know Louis Palmer, defendant's brother. I have talked with him. I have not been with him as much as I have with Ed., but I think his mental condition is as bad as Ed's or worse. I would call him an idiot. I would call his mother's condition just about like the boy's. I don't think she is any brighter than he is. She has not good sense, I don't think; that's my impression; she is not bright. All three of them are about the same. I can't see any difference worth mentioning in their conditions.

On cross-examination, witness testified as follows: I think the defendant is an idiot, but he has never been confined in an asylum for feeble-minded folks. I don't know of his working for anybody. If he has been engaged at manual labor for several years past, I do not know of his mental condition during that time. He went to the public school I think, but I don't know how long. I don't know how far he got in his books. I don't know whether he can read or write; don't know anything about his education. I know he has more sense than his brother Louis. Louis works and does as you tell him. He performs labor right along. He was never confined in a home for feeble-minded that I know of. The defendant had more sense than his brother Louis. He lived at my house one time. He would do whatever I told him to do but had to be watched. I am a first cousin of the defendant.

Defendant in addition to the foregoing testimony, introduced a number of witnesses for the purpose of showing that he was of weak mind and unable to determine the difference between right and wrong, in fact, that he was an imbecile and not a responsible or accountable person.

Among the curious features presented by this record is this excerpt: A physician testifying as an *expert,* as to the mental status of defendant and of his mother, was asked as to the latter, these questions, and gave these answers:

"Q. State to the jury, in your opinion, from what you have learned, and what you know of her mental condition, by your own observation and knowledge, what is her mental condition ?

"A. She is feeble-minded, too.

"Q. To what degree is she feeble-minded ?

"A. I could not say. *Perhaps she has more rationality than a person that would be more feeble-minded than she is.*" *A palpable truism.*

Other witnesses on the part of defendant and on the part of the State testified that defendant could read and write; that he was the brightest of all the three brothers, that his older brother William, regarded as the dullest of the brothers, owned and lived on a farm near Cedar City, was married, had one child and was making a living; that Louis worked around town at odd jobs and did good work.

Now Louis, as well as his mother, were witnesses at the trial, on behalf of defendant. And it was in evidence that defendant's father was a bright and skilled mechanic, but indolent. Other witnesses, both for State and defendant, gave testimony that they did not think that defendant was an idiot or fool either, but rather thought he was feeble-minded; that defendant worked in the postoffice two or three months as janitor, and did his work well; that he worked also in cutting up a crop of corn, and his employer stated that he never had a hand that obeyed instructions more implicitly, or did his work more satisfactorily; other witnesses thought defendant not a man of much intellect, but that he could tell right from wrong under ordinary circumstances; that he knew it was wrong to take human life. At this stage of Dr. Davis's testimony defendant's counsel was permitted, over the State's objection, to ask the physician this question:

"Q. Suppose, Doctor, that the defendant was in a room,

in his own home, with a lot of boys that came in there in a drunken condition, and demanded a right to go in where the defendant's mother was in another room, and that a controversy arose between him and one of the other parties as to whether or not that other party could go into the room where the defendant's mother was—do you think that this defendant, Ed. Palmer, would be capable of distinguishing his acts of right from wrong under those circumstances?"

"Q. Surrounded, as he was, by that excitement, and by those boys coming in there and demanding the right to go through the house and to see the defendant's mother, and his telling the boy he could not go into the room where his mother was, and surrounded in that way, and under those circumstances, and the defendant getting against the door, and telling the other fellow that he could not go in there, would you think, in your judgment, Doctor, that the defendant, Ed. Palmer, would be capable of deliberating like a sane person?

"A. I think not, in the sense that you or I would. I would not like to risk him in that state myself."

None of the physicians who had testified in the case on the part of defendant *had ever seen the boy under excitement, or had any conversation with him on the street save speaking to him in passing, and none of them had ever examined him in the slightest way or manner.*

The foregoing testimony has been carefully examined, and there was ample testimony to support the verdict of the jury, and to the triers of the facts was committed the duty, under the instructions, of determining whether defendant was criminally responsible, and they have found he was. This leaves to be examined the correctness of the instructions given.

The jury were instructed as to murder in the first and second degrees in usual form. These instructions were also given:

"2.   The jury are instructed that mere weakness of intellect will not shield one who commits a crime, and in this case, although you may believe from the evidence that the defendant is mentally deficient in some degree, yet, unless you are reasonably satisfied by the evidence that at the time the alleged crime is charged to have been committed by the defendant, his mental faculties were so weak and his mind so deficient that he was unconscious at the time of committing the act that it was wrong, and that he ought not to do it, and that he had not the ability or mental capacity to choose between right and wrong, you will find the defendant guilty as charged in the indictment.

"3.   The jury are instructed that every man is presumed to be sane and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proven, and where insanity or mental incapacity or imbecility is interposed as a defense, as in this case, the law requires the defendant to prove it to the reasonable satisfaction of the jury.   And to establish such defense, it must be proven to the reasonable satisfaction of the jury that at the time of committing the act, the defendant was laboring under such defect of reason, from natural deficiency or disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong."

The instructions just quoted, presented to the jury the law very fairly in its more particular bearing on the case at bar. Exceptions were taken on behalf of defendant to all of the instructions given at the instance of the State.

In addition to those given, the court at request of the defense gave these instructions:

"1.   The jury are instructed that the plea of insanity or imbecility of mind is a lawful one in this case, and to establish the insanity or imbecility of the defendant, positive and direct

proof of it is not required by law, and to entitle him to an acquittal by reason of his mental insanity or imbecility of any character, circumstantial evidence, which reasonably satisfies your minds of its existence, is sufficient.

"2.    The jury are instructed that insanity is a physical disease located in the brain, which disease so perverts and deranges one or more of the mental and moral faculties as to render the person suffering from this affliction incapable of distinguishing right from wrong in reference to the particular act charged in the indictment; and incapable of understanding at the time the particular act in question was a violation of the laws of God and society: Wherefore, the court instructs the jury that if they believe and find from the evidence that at the time the defendant killed the deceased, Thomas Gannaway, if they find he did kill him, as charged in the indictment, the defendant was so perverted and deranged in one or more of his mental or moral faculties or was so afflicted with imbecility or weakness or mind as to be incapable of understanding, at the moment of said killing, that such killing was wrong, and that he, the said defendant, at the time, was incapable of understanding that this act of killing was a violation of the laws of God and man; if the jury find he was so afflicted they should find him not guilty.

"3.    The jury are instructed that the indictment in this case is a mere accusation or charge and is no evidence of defendant's guilt and no juror should permit himself to be influenced or prejudiced against the defendant for or on account of such indictment.

"4.    The jury are further instructed that the law presumes the defendant not guilty of the charge in the indictment and this presumption of innocence remains and abides with the defendant in all stages of the trial until overcome by evidence which convinces the jury of his guilt beyond a reasonable doubt,

if therefore, after a consideration of all the evidence in the case, the jury entertain a reasonable doubt of defendant's guilt, it is their sworn duty to acquit him.

"5.   If the jury believe from the evidence beyond a reasonable doubt that the defendant at the county of Callaway and State of Missouri, on or about the twenty-third day of April, 1899, intentionally shot and killed Thomas Gannaway, in a heat of passion suddenly aroused by reason of said Gannaway threatening or attempting to pass through his house against his consent, then the law presumes that such killing was not done with malice but was the result of such passion, and in such case you can not find the defendant guilty of murder in either degree but you should find him guilty of manslaughter in the fourth degree and assess his punishment at two years' imprisonment in the penitentiary, or by imprisonment in the county jail not less than six months, or by fine of not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months.

"If the jury find the defendant not guilty otherwise than on the ground of insanity, the form of the verdict will be: 'We, the jury, find the defendant not guilty.'

"If you find the defendant not guilty on the ground of insanity or imbecility and that he is insane at the present time, the form of the verdict will be:  'We, the jury, find the defendant not guilty, on the ground of insanity and we further find that he has not recovered from such insanity.'

"If you find the defendant not guilty on the ground of insanity and that he has recovered from such insanity, the form of the verdict will be:  'We, the jury, find the defendant not guilty on the ground of insanity and we further find that he has recovered from such insanity.' "

Eighteen other instructions were asked by defendant, but

State v. Palmer.

refused by the court, and properly refused, because those given certainly presented the law in a very favorable light for defendant.

Presenting, as these instructions on both sides did, the whole law of the case, they afford no cause of just criticism, and this remark answers any objection made to them; besides, defendant took no exceptions as to the court's failure to instruct the jury on all questions, etc., and so is foreclosed from raising any such objection in this court. [State v. Cantlin, 118 Mo. 100, and many subsequent cases of the like tenor and effect.]

It is insisted for defendant that in his case an habitual chronic state of insanity, extending all through his life, was shown to have existed, and that the burden of proof was on the State to show a lucid interval at the time of the killing, and Lowe's case, 93 Mo. 547, is cited in support of that position; and it does support it, but that case is totally foreign to the one before us; for this is a case not of insanity either in acute or chronic form, but a case of weak-mindedness, usually called imbecility, which is a long shot from insanity and this, defendant's own medical witnesses testified was the case here.

A recent text-writer of more than ordinary excellence, touching the topic now in hand, states: *"Imbecility,* for example, in law may not only include general weakness of mind, which may be *ex nativitate,* as in the case of idiots, but dementia or the breaking down of the intellect caused by disease or old age." [Clevenger's Med. Jurisprud. of Insanity, p. 204.]

Elsewhere, the learned author says: "One may be criminally responsible where he is so under the guidance of reason as to be legally answerable for his acts, though he is suffering from mental derangement, and though he may not be capable of weighing the reasons for and against the act. The possession of sound faculties and full vigor of mind, unimpaired by disease or infirmity, is not required as a condition of criminal

responsibility. In order to be criminally responsible one must have intelligence and capacity to have a criminal intent and purpose, and if his mental powers are so deficient that he has no will or conscience or controlling mental power, or, if from the overwhelming violence of mental disease his intellectual power is for the time obliterated, he is not criminally responsible, the question to be determined being whether, at the time of the act, he had the mental capacity to entertain a criminal intent, and whether in point of fact he did entertain it. Mental disorders can not be regarded as evidence of insanity which will confer legal irresponsibility for crime, however, unless they are caused by or result from disease or lesion of the brain, and the criminal act must have resulted from the unsoundness of mind, and they must be so excessive as to overwhelm the reason, conscience and judgment. Thus, mere weakness of mind does not excuse crime, nor will bad education or bad habits nor the fact that the person is of a low order of intellect. . . . . . Neither is crime excused because committed under the influence of fear and excitement, or bad passion, or jealousy. And unreasonable wrath and anger do not affect criminal responsibility where the reason is not actually dethroned; and the rule is the same though they may temporarily dethrone reason, or for the time being control the will where the inability to control it arises from passion and not from insanity. Mere frenzy or ungovernable passion, however furious, is not insanity within the meaning of the law." [Ib. 125, 126, 127.]

And he further states that: "Imbeciles afford every grade of intelligence below the normal, and education, station, resources, etc., modify the aspects of their mental deficiencies, so that no possible standard can be invented that will divide imbeciles, even with approximate correctness. Hoffbauer's

suggestion of three stages of imbecility failed, as some superiority of intellect would be included in an inferior grade, and vice versa." [Ib. 229.]

The quotations made are fully supported by the authorities there cited, and they sustain the correctness of the two instructions copied above, given at the instance of the State. And although the defense in this case is weak-mindedness or imbecility, yet the same test, that of the ability to distinguish right from wrong in the doing of the particular act, must be applied to imbecility as well as to insanity.

I have heretofore quoted certain questions propounded to Dr. Davis on behalf of defendant, and to which the doctor gave a certain answer. These questions were objected to by the State, though the stenographer has not preserved the reasons given for the objections made, but which the court overruled. These objections should have prevailed, or the court should of its own motion have prevented the questions from being asked or the answer given; and for these reasons:

In the first place, there was not a particle of evidence that defendant exhibited any signs or token of excitement on the occasion of the shooting; the evidence is entirely the other way. In the second place, there was not an iota of evidence that any of the young men who went to defendant's house on that Sunday were in a drunken condition. Nor, in the third place, that they, or any one of their number, demanded the right to go into another room of the house where defendant's mother was. Nor, in the fourth place, that any controversy arose as to going into the other room. In the fifth place, the very point at issue was whether defendant could distinguish right from wrong in doing the act charged as criminal. This was for the determination of the jury; and an expert can not be allowed by answer to an improper question to usurp the province and functions of the triers of the facts.

[Graney v. Railroad, 157 Mo. loc. cit. 683; Lawson Exp. Evid. (2 Ed.), 172.]

An expert witness can not be asked his opinion as to whether the accused was capable of judging between right and wrong. [Shults v. State, 37 Neb. 497; Reg. v. Layton, 4 Cox, C. C. 149.] Nor to express an opinion that the accused acted under an insane delusion or was impelled by an irrepressible impulse. [Patterson v. State, 86 Ga. 70.] And an expert witness may give his opinion as to the state of mind of the accused, but not as to his responsibility, that being a question for the jury. [Reg. v. Richards, 1 Frost. & F. 87; Reg. v. Burton, 3 Frost. & F. 772; People v. Thurston, 2 Park. Crim. Rep. 49; 1 Clevenger's Med. Jurispru. of Insan. 585, 586.]

And it has been generally, if not universally held in cases where the objection has been made, that the question covered the point in issue, that the experts can not be asked the broad question whether they consider the person whose sanity is being litigated is out of his mind, or whether his mind was so affected as to be unfit to transact business (Deshon v. Merchant's Bank, 8 Bosw. 461; Chickering v. Brooks, 61 Vt. 554); or to give their opinions on the whole case, as it would necessarily include a determination of the facts. [Negro Jerry v. Townshend, 9 Md. 145; Yardley v. Cuthbertson, 108 Pa. St. 395; In re McCarthy, 55 Hun 7; People v. Lake, 12 N. Y. 358; Clevenger's Med. Jurisprudence of Insanity 542, et seq.]

These authorities effectually show the incompetency of the question asked Dr. Davis as to what was the condition of defendant's mind on the day of the homicide.

Notwithstanding it was permitted defendant to ask Dr. Davis and others such questions as above quoted over the State's objections, yet, when the State attempted to do the same thing

and was granted the privilege exception was saved there and complaint made here because of that fact. Having enjoyed permission to successfully ask wholly incompetent and improper questions on a certain subject, it does not lie in the mouth of the party thus doing, to complain of error in permitting his adversary to pursue a similar course. This is enough to say about the point that error occurred in overruling defendant's objection to an incompetent hypothetical question asked by the State.

It has already been stated that none of the physicians who were witnesses for the defendant had seen defendant under excitement or had conversed with him or had made any examination of him; and they evidently, that is, most of them, felt on that account a hesitancy in testifying on the subject; and such hesitancy was based on the correct principle, as shown by the authorities.

Thus, the testimony of a physician who had not studied the progress of the disease in question, and whose opportunities were limited for observing the personal habits and conduct of the person whose sanity is questioned, possesses little if any value, and so it has been ruled.

And so, where a person is alleged to be an imbecile, such imbecility has been held not established, "on the evidence of two medical witnesses, neither of whom had ever conversed with him until the day before the filing of their report, and who had had no opportunity to test his mental condition." [1 Clevenger Med. Jurisprudence of Insanity, and cases cited.]

Relative to the point about the affidavit of defendant's counsel that two of the jurors made admissions to him derogatory to, and inconsistent with their verdict, it suffices to say, what indeed every lawyer is supposed to know, that for about three quarters of a century in this State the inflexible rule has

been that a juror by his statement nor by his affidavit is allowed to impeach his verdict.

I have thus considered the salient points presented in this record; the others, not mentioned, are frivolous and without merit.

The premises considered, the judgment will be affirmed. All concur.