SNOQUALMI REALTY COMPANY, Appellant, v. MOYNIHAN et al.; SNOQUALMI REALTY COMPANY v. MOYNIHAN et al., Appellants.

Division One, February 10, 1904.

1. **Appellate Jurisdiction:** CROSS-APPEALS: AMOUNT IN DISPUTE. Where both sides appeal from the judgment of the trial court, and the amount in dispute in either appeal would send the case to the Supreme Court, then both appeals should be sent to the Supreme Court.

2. **Builder's Contract:** REJECTED MATERIALS: OVERPAYMENT. In a suit against the builder of a house for overpayment, on account of failure to put in the kind of material called for by the contract, if the evidence shows some materials were properly rejected and others not, but there are no data to fix the value of those properly rejected or of those improperly rejected, the whole item should be disallowed, since there is no sufficient basis for apportioning the claim.

Snoqualmi Realty Co. v. Moynihan.

3. ———: REFERENCE: CONFLICT IN EVIDENCE: APPELLATE PRACTICE. Where there was a sharp conflict in the evidence as to whether the work done and the materials furnished by the contractor of a house did or did not meet the requirements of the specifications, the appellate court will not interfere with the finding of the referee and of the trial court as to those matters.

4. ———: ———: ERROR INVITED BY APPELLANT. Where the ruling of the trial court was invited by appellant he can not complain thereof on appeal. Where the owner of a building claimed $100 for painting certain wood work in his dining room because the material furnished by the contractor did not conform to the specifications, and the referee found for him in that sum, to which finding the contractor excepted on the ground that if the wood work did not conform to the specifications the owner had a right to have it made to conform to them, and the trial court sustained the exception and charged the contractor with what the evidence showed it would cost to make the wood work conform to the specifications, to-wit, $329, the contractor on appeal can not object.

5. ———: MATERIAL: ORAL EVIDENCE: USAGE. Proof of usage is often admitted to determine the meaning of language used in a written contract. And in this case oral testimony was properly admitted to explain that "San Domingo mahogany" used in a contract for a St. Louis residence did not mean mohogany grown on the island of San Domingo, but mahogany grown in that latitude and similar in texture, color and figure. Such evidence is received on the theory that the parties knew of the usage or custom and contracted in reference to it.

6. ———: ———: DECISION OF ARCHITECT: FRAUD. The decision of the architect, although vested with almost plenary powers, that the material used in the construction of a building is a compliance with the contract, if in fraud of the rights of the owner, is not binding, and he is liable to the owner for the injury; but if his decision is honest and impartial, it is binding on both owner and contractor within the limits of the powers conferred on him by the contract.

Appeal from the St. Louis City Circuit Court.—*Hon. Selden P. Spencer,* Judge.

AFFIRMED.

*George W. Lubke* for Snoqualmi Realty Company.

*Campbell & Thompson* for Moynihan.

(1)    Where there is evidence to support the referee in his finding of facts, this court will not disturb such finding.    Tufts v. Latshaw, 172 Mo. 359; Bank v. Donnell, 172 Mo. 384.    (2)    The court properly overruled plaintiff's second exception to the referee's report, relative to the authority of the architect.    Clark on Architects, 82; Lloyd, Building & Building Contracts, sec. 11; Beach on Contracts, sec. 113; Wait on Law of Construction, sec. 446; Board, etc., v. Motherwall, 123 Ind. 364; Guerin v. Rodwell, 33 N. J. L. 177; Dist. Columbia v. Gallagher, 124 U. S. 505; Bonnett v. Glattfeldt, 120 Ill. 167; O'Dea v. City of Winona, 41 Minn. 427; Chettwood v. Berrian, 39 L. J. E. 207; Stamping Co. v. Hemminghaus, 157 Mo. 23; Chapman v. Railroad, 114 Mo. 542; Estell.v. Railroad, 56 Mo. 285; Williams v. Railroad, 112 Mo. 493; Denny v. Kile, 16 Mo. 450; Ruggles v. County, 3 Mo. 504; McNichols v. Nelson, 45 Mo. App. 446; McLachlen v. Baker, 64 Mo. App. 511. (3)    The court properly overruled plaintiff's third and fourth exceptions to the finding of the referee, that the term "San Domingo mahogany" was a trade term.    The finding of the referee that the term is a trade term, and by it is meant, in an architectural sense, good figured mahogany, equal in density to that known as "San Domingo," that it is not necessary that such mahogany be actually grown on the island of San Domingo, is abundantly supported by the evidence of both plaintiff's and defendant's witnesses, and is the only conclusion reasonably possible to be drawn from the evidence. Sautier v. Kellerman, 18 Mo. 509; Fitzsimmons v. Academy, 81 Mo. 37; Evans v. Western Brass Mfg. Co., 118 Mo. 542; Connable v. Clark, 26 Mo. App. 162; Cole v. Skrainka, 37 Mo. App. 426; Price v. Vanstone, 40 Mo. App. 207; Deutman v. Kilpatrick, 46 Mo. App. 624; Cameron v. Real Estate Co., 76 Mo. App. 366; Wilcox

v. Baer, 85 Mo. App. 587; Baer v. Glazer, 90 Mo. App. 289. (4) The court properly overruled plaintiff's fifth exception relative to the finding of the referee, that plaintiff was not entitled to any sum by reason of the contractor's delay in completing the building. Lloyd, Building, p. 56; Turner v. Mellier, 59 Mo. 535; Eldridge v. Fuhr, 59 Mo. App. 44; Sawyer v. Christian, 40 Mo. App. 295; Denny v. Kile, 16 Mo. 450; Starr v. Gregory Con. M. Co., 13 Pac. 195; Weeks v. Little, 89 N. Y. 566; Westwood v. Sec'y, etc., 7 L. T. (N. S.) 736; Holme v. Guppy, 3 Mees. & W. 387; Russell v. The Bandeira, 37 L. J. (N. S.) 68; Van Baskirk v. Stone, 42 Barb. 9; Green v. Haines, 1 Hilt. 254; Palmer v. Stockwell, 9 Gray 237; Smith v. Gugerty, 4 Barb. 614. (5) The court erred in sustaining in part plaintiff's sixth exception; that is, the court erred in so far as it held that plaintiff was entitled to recover an amount equal to the sum that it would have been necessary for the plaintiff to have spent for the purpose of removing and reconstructing the woodwork in the room above the dining-room, which sum it fixed at $326. (6) The court erred in overruling defendant's exception No. 10 to the referee's failure to find that the change from Ludovici to Spanish tile was unauthorized; and entailed an additional cost of $280 upon this defendant, and discharged his surety.

*Johnson & Richards, George H. Williams* and *Henry W. Allen* for American Surety Company.

A surety has the right to stand on the strict terms of his contract, and if there is a departure therefrom he will be discharged. Lumber Co. v. Gates, 89 Mo. App. 205; Beers v. Wolf, 116 Mo. 187. Clause "Third" of the contract provided for changes and alterations in the work. In order to continue the liability of the surety, any changes or alterations must be made as provided in the contract. Beers v. Wolf, 116 Mo. 186; Lumber Co. v. Gates, 89 Mo. App. 206. As alterations

were made without the knowledge or consent of the surety and without a written order from the architect, as provided in the contract, the surety is discharged. Under the contract and the specifications the architect was made the agent of the owner with very broad powers. In ordering the changes that were made he did not exceed these powers and the plaintiff is bound by his acts. The changes made were not trivial, but were of substantial cost to the contractor, and the maxim *de minimis non curat lex* does not apply.

MARSHALL, J.—These two cases are cross-appeals from the judgment of the circuit court of St. Louis, in the case of Snoqualmi Realty Company, plaintiff, against Patrick J. Moynihan and the American Surety Company, defendants. The case is a suit upon a builder's bond for ten thousand dollars, Moynihan being the principal and the American Surety Company the surety in the bond, and the plaintiff the obligee in the bond. The plaintiff claimed $9,154.16 damages for the breaches of the bond. The defendants denied any breaches and all liability, and the surety pleaded release by virtue of various acts of the parties. On motion of the plaintiff, and without objection or exception by the defendants, the cause was referred to E. T. Farish, Esquire, as referee. After a long and thorough trial, the referee made an exhaustive, learned and detailed report, covering seventy-three printed pages, in which he recommended a judgment for the plaintiff for $1,518.09, with interest at the rate of six per cent from the commencement of the suit, on September 28, 1898. Both parties filed extensive exceptions to the report. The trial court heard the exceptions, and in a forceful and very convincing opinion covering fifteen printed pages, overruled the defendants' exceptions, and sustained the plaintiff's exceptions, so far as to increase the plaintiff's recovery from $1,518.09, as recommended by the referee, to $1,847.69, and allowed interest thereon

from the institution of the suit, and entered judgment for the plaintiff for $2,099.59.

After proper steps, both parties appealed. Because the plaintiff's claim brought the case within the jurisdiction of this court, its appeal was allowed to this court. The defendant's appeal was allowed to the St. Louis Court of Appeals, and that court properly certified the case to this court, under the rulings of this court in Ellis v. Harrison, 104 Mo. 280, and Douglas v. Kansas City, 147 Mo. 428. Manifestly the same case can not be pending in two appellate courts at the same time, although upon cross-appeals, for incongruous results might ensue for inconsistent judgments rendered by the two courts. This case illustrates the rule. The defendant, contractor, claims that he owes the plaintiff nothing, and the defendant, surety, claims it was released from liability on the bond. The judgment against them was for $2,099.59. On the other hand the plaintiff got a judgment for $2,099.59, upon a claim for $9,154.16, and appealed because it was not allowed the difference. If the Court of Appeals on the defendant's appeal should reverse the judgment and hold that the plaintiff was entitled to nothing against the principal in the bond or that the surety was released, and if this court should affirm the judgment on the plaintiff's appeal or should hold that the plaintiff was entitled to even more than the amount for which it recovered judgment, a manifest incongruity and inconsistency would be the result. Hence the wisdom of holding that in such cases the case can not be split up, but that the whole case must go to the appellate court that has jurisdiction of the appeal by either party.

The controversy is this:

The plaintiff contracted with the defendant Moynihan to build for it a certain house, upon lot numbered 66 in Bell Place, in St. Louis, according to plans and specifications drawn therefor by architect J. B. Legg, at an agreed price of $18,800. The contract was executed on

November 7, 1896, and the work was to be completed by August 1, 1897. The work was not completed on October 1, 1897, and on that day the plaintiff took possession over the objection of the contractor. During the progress of the work the plaintiff paid the contractor the sum of $13,000. After differences arose and after the plaintiff took possession, and to avoid the expense of mechanic's liens, the plaintiff, under a tripartite agreement between the plaintiff, the contractor and the surety, paid to the sub-contractors and materialmen the further sum of $6,590.69. The plaintiff concedes that the defendant, contractor, was entitled to $235 for extra wainscoting, and to $15 for extra partition wall in third story, in addition to the contract price of $18,800, thus increasing the plaintiff's credit to $19,050. And thus the plaintiff shows that it overpaid the contractor in the sum of $540.69, for which it asks judgment.

The plaintiff further claims that the contractor did not complete the work at the time agreed and that by the terms of the contract it is entitled to recover five dollars a day as liquidated damages from August 1, 1897, to November 1, 1897, aggregating $540 for the delay.

The plaintiff further claims that the contractor failed to put into the house the kind and quality of the mahogany, cherry, bird's eye maple and oak wood required by the specifications, and instead thereof the plaintiff was forced to have the work done over, at a cost to the plaintiff of $5,822, for which it also asks judgment.

The plaintiff also claims $783.25 on account of improper stone work put in by the contractor, and further claims $429.77 on account of defective granitoid walks and driveways put in by the contractor; and further claims $91.50 for cost of repairs to the woodwork made necessary by the reconstruction of the hardwood work aforesaid; and further claims $408.81 on account of certain minor items of cost in completing the work contracted for; and also claims $595 for cost of watchmen

and of coal for heating the house while the work of completing and correcting the work contracted for was being done after the plaintiff got possession. Thus making an aggregate claim of $9,450.02, from which the plaintiff allows a deduction of $100.60 on account of the sum realized by the plaintiff for the sale of the materials that were put in by the contractor and rejected by the plaintiff.

On the other hand the contractor denies any liability to the plaintiff, and says the work was done according to the contract and specifications and to the directions of the architect, and pleads that the delays were caused by the acts and interferences of the plaintiff.

The surety denies that there is anything owing to the plaintiff, and pleads that it was released, by force of various acts of the plaintiff, which are fully set out and which will be stated and considered in the course of the opinion.

The referee allowed the plaintiff $440.09 for overpayment, and $1,078 for reconstructing the woodwork in the parlor, the library, the bedroom over the parlor, and the painting in the room over the dining room, aggregating $1,518.09, and found against the plaintiff on all of the other claims, and found against the defendants on their other claims and defenses. The circuit court approved all the findings of the referee, except as to the painting in the bedroom over the dining room, for which the referee had allowed one hundred dollars, and in lieu thereof found that the plaintiff was entitled to $329 for refinishing that room, and except as to $100 realized by the plaintiff from the sale of the rejected materials, which the court disallowed, and entered judgment for the plaintiff for $1,847.69 with interest.

The facts necessary to be considered in the determination of the case will be stated in the opinion. For the sake of convenience the plaintiff's contentions will be considered first, and those of the defendant afterwards.

### I.

*Overpayment.*

The trial court properly held that the plaintiff was entitled to recover $540.69 for overpayments. The referee allowed $440.09 and gave the defendant credit for $100.60 which the plaintiff received from the sale of rejected materials. The referee and the court held that the plaintiff had properly rejected some and improperly rejected other materials, and the court held that if there had been any way to separate or apportion the $100.60 between the two, the defendants would have been entitled to credit for the portion representing the proceeds of the sale of the improperly rejected materials, but inasmuch as there was no sufficient data furnished for such an apportionment, the defendants were not entitled to credit for any part of the $100.60. The allowance to plaintiff of $540.69, on account of overpayments was therefore correct, and the judgment therefor must be approved.

### II.

*Defective Woodwork.*

The referee allowed the plaintiff $326, each, aggregating $978, for improper woodwork done in the parlor, the library and the bedroom over the parlor, and also $100, the sum that the plaintiff had paid for painting the improper woodwork in the room over the dining-room, instead of making the necessary changes so as to bring the work up to the specifications. The court approved the finding of the referee, in all respects, except as to the $100 for such painting, and held that instead of allowing that sum for painting, the plaintiff should have been allowed $329, the reasonable cost of making the woodwork in that room conform to the specifications.

As to the allowance of $978 for the three rooms first described, it need only be said that in this court the mat-

ter is not subject to review, for the reason that there was a sharp conflict in the evidence as to whether the work done and the materials furnished by the contractor did or did not meet the requirements of the specifications, and under such state of the record, this court will not interfere with the findings of fact by the referee and the trial court. [Tufts v. Latshaw, 172 Mo. 359; Bank v. Donnell, 172 Mo. 384; Utley v. Hill, 155 Mo. 232; Howard County v. Baker, 119 Mo. 397; Vogt v. Butler, 105 Mo. l. c. 485; Ferry Co. v. Railroad, 73 Mo. 389; Hardware Co. v. Wolter, 91 Mo. 484.]

As to the room over the dining room, it appeared that the woodwork was subject to nearly the same objections as in the three rooms aforesaid, but that instead of having it taken out and new and proper woodwork put therein, the plaintiff had it painted at an expense of $100. The defendants objected to this, and claimed that they could not be made liable for the charge, and that if the woodwork in this room did not conform to the specifications, the plaintiff had a right to have it made to conform to them, and that the defendant would be liable for the cost of so doing. The court sustained the contention and charged the defendants with $329 therefor, that being the amount for which the plaintiff had obtained a bid to do such work for. Having induced the court to so rule, the defendants can not be heard in this court to object to the ruling, for the error, if it be error, was invited by the defendants. [Stewart v. Outhwaite, 141 Mo. 562; Sprague v. Sea, 152 Mo. 327; State v. Manicke, 139 Mo. 545; Carlin v. Haynes, 74 Mo. App. 34; Guntley v. Staed, 77 Mo. App. 155; State v. Palmer, 161 Mo. 152.]

The ruling of the trial court in this regard is therefore not open to review, at the defendant's instance in this court.

Thus it appears that the judgment for the plaintiff for $1,847.69, with six per cent interest from the institution of this suit, on September 28, 1898, was proper and without reviewable or reversible error unless some

of the special defenses of the defendants or some of the claims of the plaintiff for other items should be found to be tenable.

### III.

*Delays.*

The plaintiff claims $450 for delay. The contract provided that the work should be completed on August 1, 1897, provided the lines and levels of the building be furnished the contractor on or before November 12, 1896. The work was not, in fact, completed at the time the plaintiff took possession on October 31, 1897.

It is not clear from the facts disclosed by the abstract of the record, whether the lines or levels were furnished to the contractor before November 12th. The contract was signed on November 7th, the contractor began work on November 9th, and the testimony shows that the lines and levels were furnished a few days after the work began, but how many days is covered by the term "a few days" nowhere appears. The referee and trial court denied the plaintiff's right to recover for delays, basing the ruling upon the ground that the plaintiff had interfered with the contractor in his work, and that the effect of a letter written by the plaintiff to Legg and by him forwarded to the contractor, and dated July 21, 1897, was to suspend the work, which at that time was about seven-eighths finished. In that letter the plaintiff objected to the oak wood and the mahogany that was used in the house.

As the learned referee aptly states it, "the storm center of this controversy" is in respect to the hardwood used in the building. The trouble began in January, 1897, assumed form in July and culminated in the plaintiff rejecting all the woodwork and having it done over again after it obtained possession on October 31. In view of the bitter feeling that grew up between the plaintiff and the contractor before August 1, 1897, and of the

plaintiff's condemnatory letter of July 21st, and the un-certainty in which the whole matter was involved in con-sequence thereof, and in further view of the uncertainty in the evidence as to whether the condition precedent to the contractor's liabilty for delay was complied with, it can not be fairly held by this court that the referee and trial court were in error in not allowing the plaintiff anything for delay, and the judgment in this regard will not be disturbed by this court.

## IV.

### Trade Terms.

After the plaintiff got possession of the house on October 31, 1897, it condemned nearly all the hardwood work that the contractor had put in, and had it taken out and the work done over again at a cost of $5,822, and this is the principal controversy between the parties. The trial court allowed $1,307 on this account, being $326 each for the parlor, library, and room over the parlor, and $329 for the room over the dining room, and re-jected the balance of the claim.

The parlor was to be finished in maple, the ceiling of the dining room in oak, the library in cherry, the room over the parlor in cherry, the room over the library in maple, the room over the dining room in cherry, and the front vestibule door frames, the reception hall, the main stair hall, the archway in the first and second story of the main stair hall, the panel wainscoting and ceiling in the main stairway, the pilasters and beam under the ceiling in the second story and the landing of the main stairs, were to be of selected San Domingo mahogany.

As above stated, the trial court held that the work in the parlor, library, and the rooms over these two rooms was not up to the specifications. As to all the other rooms, except where mahogany was to be used, the court held that the work was fully up to the requirements of the specifications, and as there was substantial evidence

upon which to base that holding, this court will not interfere with the judgment in that regard.

As to the work where mahogany was to be used: The evidence is uncontradicted that no San Domingo mahogany was used, but that in January, when the sub-contractor was about to begin with the woodwork, he went to see the architect and the architect showed him a sample of mahogany he had obtained from Seidel in St. Louis. The sub-contractor took the sample, and afterwards reported to the architect that no San Domingo mahogany of the requisite sizes could be had in St. Louis, and he thereupon showed the architect a sample of Mexican mahogany which he proposed to use, and said that he did not want to order the wood unless the architect would approve the work. The architect examined the sample, and approved it and told the sub-contractor to go ahead and use it. Before doing so, however, the contractor took the sample to the residence of the president of the plaintiff company, and showed it to him and his two sisters, and he and the latter compared it with some mahogany furniture they had in the house and declared that it was not San Domingo mahogany, and directed the contractor not to use it. He replied that the architect had approved it and he intended to use it, and he proceeded to do so. Nothing further was said or done about it, however, until July 21st, when the plaintiff wrote to the architect saying the mahogany used in the house was not San Domingo mahogany, and it insisted upon having that kind of mahogany. The architect forwarded the letter to the contractor, but the contractor proceeded with the work, after a short cessation in consequence of the letter, and substantially completed it, before the plaintiff took possession on October 31. Thereafter the plaintiff had all the mahogany taken out, and mahogany obtained in Boston was put in, and this constitutes the chief contention in this case.

The defendants contend that the call in the specifica-

tions for select San Domingo mahogany does not mean mahogany that was grown on the island of San Domingo but that it is a trade term in St. Louis, and when employed in building specifications it means a good figured mahogany, equal in density to that known as San Domingo. The architect testified: ''Mahogany to satisfy the requirements 'San Domingo' need not be actually the product of the island of San Domingo. May be grown elsewhere, but is substantially to the eye, of texture and color, as if actually grown there. It is mahogany grown in that latitude. It is very seldom called for in specifications. Impossible to get it in St. Louis market. Is very expensive and rare. Most all mahogany grown in San Domingo goes east. Color and texture is what is required. Don't care whether it grows on island of San Domingo or in Central America or tropical America.''

Other witnesses testified to the same effect. In fact, there is no substantial testimony to the contrary in the case. It also appeared that the architect saw the mahogany when it was in the sub-contractor's shop being worked up for use in the house, and also while it was being put into the house, and that he approved it, and said he was pleased with it. In short, it clearly appears that what the contractor did in this regard was done with the knowledge, consent and approval of the architect. The crucial question, therefore, is whether it was competent for the defendant to give to the term San Domingo mahogany, used in the specifications, a technical meaning among the trade in St. Louis, and also whether the plaintiff is bound by the act of the architect in approving the mahogany that was used by the contractor.

The rule of the law in this State bearing upon the first question, is thus tersely and aptly stated by BLACK, J., in Evans v. Western Brass Manufacturing Co., 118 Mo. l. c. 553: ''The general rule undoubtedly is, that parol evidence can not be admitted to contradict, add to, or vary a written contract; and it is the duty of the court

to construe the writing.   [Bunce, Adm'r, v. Beck, Ex'r, 43 Mo. 266; Black River Lumber Company v. Warner, 93 Mo. 374; State ex rel. Yeoman v. Hoshaw, 98 Mo. 358.]  But it is equally well settled that proof of usage is often admitted to determine the meaning of the language used; for under many circumstances the parties may be supposed to contract with reference to a usage or custom, as they are presumed to use words in their ordinary signification.   [1 Greenleaf on Evidence, sec. 292.]  'The courts,' says Starkie, 'have long allowed mercantile instruments to be expounded according to the usage and custom of merchants, who have a style and language peculiar to themselves, of which usage and custom are the legitimate interpreters.'   [Starkie on Evidence (1 Ed.), p. 701.]   Hence it has been held by this court that it may be shown by way of a general and well-established custom that two packs of shingles of a certain size constitute a thousand.   [Soutier v. Kellerman, 18 Mo. 509.  See, also, Blair v. Corby, 37 Mo. 314; Kimball v. Brawner, 47 Mo. 398; Fruin v. Railroad, 89 Mo. 397; Wolff v. Campbell, 110 Mo. 119; Robinson v. United States, 13 Wall. 365.]  It is true, as some of these cases just cited show, that usage can not be permitted to control the terms of a special contract by introducing something which is repugnant to or inconsistent with the contract.   But it does not follow that evidence of usage can only be received where the words of the contract are ambiguous.   Such evidence is often received to show that words are used in a sense different from their ordinary meaning, as in Soutier v. Kellerman, supra.   Such evidence is received on the theory that the parties knew of the usage or custom and contracted in reference to it, and in such cases the evidence does not add to or contradict the language used, but simply interprets and explains its meaning.''

Applying this rule to the facts in the case at bar, there is no room left for doubt that the term San Domingo mahogany, when used in specifications, in St.

Louis, is a trade term and that it does not mean mahogany that was grown on the island of San Domingo, but means a good figured mahogany, equal in density to that known as San Domingo mahogany. In fact, there is some evidence in the record that of late years the government of San Domingo has prohibited the cutting of the mahogany trees on that island. There is also no substantial conflict in the evidence that the mahogany the plaintiff had put in after it got possession of the building was not San Domingo mahogany, but was practically the same kind of mahogany that the defendant contractor put in and which the plaintiff had removed.

It can not be doubted from the testimony of the architect in this case, and from his acts and conduct during the progress of the work throughout the whole controversy, that when he used the term San Domingo mahogany in the specifications, he intended it in the trade sense and not in the ordinary sense of the term, and, therefore, the parties must have intended that it should be so understood. So construed, the contractor complied with the specifications, and the action of the plaintiff in removing the mahogany that the contractor put in the house, was without legal right or excuse, and therefore the plaintiff is not entitled to recover anything from the defendants on this account. This conclusion makes it unnecessary to consider fully the power of the architect to bind the owner by accepting and approving the work. It is enough to say that the architect fully approved the acts of the contractor with respect to the mahogany at all stages of the work, and that the contract of the parties in this case clothed the architect with broad and almost plenary powers in this regard, and that there is no room to doubt the honesty or impartiality of the architect in this particular or in any respect in this case. If owners do not desire to be bound by their architects with respect to their acts in accepting or rejecting the work or materials that go into their houses, they should

be more careful in conferring such broad powers upon them, and should not attempt to hold the contractor bound by the decisions of the architect, while repudiating the power of the architect to bind them. On the other hand architects should carefully avoid acting in fraud of the rights of either party to the contract while exercising the powers conferred, for if they so do their acts are not binding, and they are liable to the party injured by the fraud.

It follows that the judgment of the circuit court upon this branch of the case was without error in law or in fact.

And this conclusion also disposes of the plaintiff's claim for $91.50 for repairs on woodwork made necessary by the reconstruction of the cabinet work.

## V.

*Stone Work and Granitoid Walks.*

The judgment of the trial court with respect to the claim of the plaintiff for $783.25 for alleged improper stonework, is not open to review in this court, because there was a sharp conflict in the evidence as to whether the contractor had failed in his duty in this respect.

The rule also applies to the claim for $429.77 on account of alleged defective granitoid walks and drives. There was also evidence to the effect that the defective condition of these walks and drives was attributable to the fact that they were not required to be of sufficient thickness, and the sub-contractor called attention to this feature when he was doing the work, and said that a good job could not be expected.

The rule also applies to the claim for $408.81 for certain minor items. The evidence was conflicting and this court will not interfere.

## VI.

*Watchmen and Heating.*

The plaintiff claims $595 for the cost of watchmen and of coal for heating the house while the work of refinishing the house was in progress and after the plaintiff got possession. It has already been shown that the plaintiff was not justified in having the bulk of this work done, but was justified in having the work in the parlor, library, and the room over the same, done over again. As to this part of the cost, the plaintiff would be entitled to recover. But the trouble is that the claim is made in bulk and there is no sufficient data given for apportioning the claim between the part the plaintiff is entitled to recover and the part it is not entitled to recover.

Under these conditions this court can not interfere.

This disposes of all the claims of the plaintiff, and leaves for consideration the special defenses of the defendants.

## VII.

*Release of Surety.*

The defenses of the contractor have been disposed of in the decision of the plaintiff's claims, and as the contractor asks no affirmative relief, no further attention need be given to his defenses.

The surety claims to have been released by the following circumstances and acts of the plaintiff: First, that after the contract was executed it was changed by adding two pages to the specifications, by which the original specifications, which gave the contractor the option to use either Spanish or Ludovici tile on the roof of the house, was taken away, and instead he was required to use Spanish tile, and that the contractor had intended to use Ludovici tile, and the change caused a loss of $280 to the contractor; second, that a brick wall was required to be put in under the library, at a cost of $65 or $70 to the contractor; third, that additional supports

were required to be put in to stiffen the roof, at a cost of $75 or $100 to the contractor; fourth, that the excavation for the cellar was reduced and the elevation of the house thereby increased. No extra cost to the contractor is charged therefor.

As to the first contention, it appears that there were two pages added to the specifications whereby the contractor was required, *inter alia,* to use Spanish tile on the roof, and was not given the option to use Spanish or Ludovici tile, as the specifications first called for. But there is no substantial conflict in the evidence that this change was made before the contract was executed by the parties or signed by the surety. In fact it is uncontradicted that in consequence of this change the contractor increased his bid from $18,420 to $18,800.

There is no room for doubt that the specifications under which the work was done were the specifications intended by the contract, and hence the parties are bound thereby notwithstanding the parties did not identify the specifications as the contract seemed to require, but the architect alone signed them.

The first claim to a release is therefore untenable.

As to the second and third contentions, it appears that the brick wall under the library and the additional supports under the roof, were put in by the contractor, voluntarily, in order, as he expressed it, to make a good job, and the contractor makes no affirmative claim for any such extra work in his pleadings. The whole matter is apparently an afterthought and the referee and trial court properly held that the contention was untenable.

As to the fourth contention: The cellar was not excavated to the depth contemplated, and in consequence the house stood higher out of the ground. The only difference that was thereby made was to save the contractor the cost of one foot and six and a half inches of excavation. The dimensions and amount of work upon the house was otherwise unchanged.

Of this claim it is only necessary to say that the third and ninth clauses of the contract contemplate that alterations might be made in the plans and specifications, and that the architect should have power to add or omit work as might be deemed necessary, and that the contractor should be paid for all additional work.

In view of this provision of the contract and of the contention of the surety with respect to the powers of the architect, so far as they apply to the claim of the plaintiff, it does not lie in the mouth of the surety to claim that the architect had not the power to order the excavation aforesaid to be omitted.

This disposes of the questions of release urged by the surety, and leads to the conclusion that the judgment of the circuit court must be affirmed. It is so ordered. All concur.