CITIZENS COAL MINING COMPANY, Respondent,
v. McDERMOTT, Appellant.

**St. Louis Court of Appeals, December 27, 1904.**

REFERENCE: Findings of Referee.    The finding of facts by a
referee in a case at law stands as the verdict of a jury; and
where such finding is supported by substantial evidence, and
there are no controverted legal questions in the case, the judg-
ment of the trial court in conformity with the finding will be
affirmed.

Appeal from St. Louis City Circuit Court.—*Hon. Walter
B. Douglas* and *Hon. Jesse A. McDonald,* Judges.

AFFIRMED.

*Cunningham & Maurer* and *R. P. & C. B. Williams*
for appellant.

*Campbell & Thompson* for respondent.

BLAND, P. J.—This cause was referred to Hon.
Daniel Dillon, who, after qualifying as referee and hear-
ing the evidence introduced by both parties, made the
following report:

"PLEADINGS.

"The second amended petition alleges that plain-
tiff is a corporation and is the owner and operates coal
mines near Springfield, Illinois, and that the defendant
McDermott Coal Company was organized in February,
1898, but at what time thereafter it was incorporated,
if at all, plaintiff is not advised, and that defendant Ed-
ward McDermott, at all times mentioned in the said pe-
tition conducted and transacted the business mentioned
in said petition under the name of said McDermott Coal
Company.

"Said petition further alleges that from and after July, 1896, till the end of the year 1898, Edward McDermott, acting and doing business as aforesaid, and the defendant, the McDermott Coal Company, was the agent of plaintiff to handle and sell coal of plaintiff shipped by it to be sold and disposed of by defendant in the market at St. Louis, Missouri, and points contiguous thereto, and that defendants accepted said employment and during said time undertook to sell the coal so shipped and account to plaintiff for the proceeds of the sales thereof, and that for all such coal, except that sold to Nelson Morris Packing Company, and for all said time except the months of September, October, November and December, 1898, defendants were to receive ten cents per ton commission, and during the months last mentioned defendants were to receive five cents a ton commission. And for all said coal sold to said Nelson Morris Packing Company defendants were to receive two and one-half cents a ton.

"Said petition then alleges that defendant, in making returns to plaintiff, retained a larger percentage than was agreed to as aforesaid and converted and appropriated to their own use larger sums of money than they were entitled to, and that instead of making true statement of the prices at which they had sold said coal, made returns of prices lower than the price in fact received from said coal, and retained commissions far in excess of the commissions they were entitled to retain. And plaintiff only became aware of such fraud and deception the latter part of December, 1898, whereupon it stopped shipping any more coal to defendants, and plaintiff was not then fully apprised of the extent of said frauds and deception, and only learned afterwards of the parties to whom and the prices at which said coal had been sold and the amount of coal so sold to said parties respectively, and as to many parties it has been unable to ascertain or obtain the evidence to establish said frauds and deception. That as to said parties with

reference to whom plaintiff has been able to find evidence as to the extent of the transactions, plaintiff files with its said petition a statement 'Exhibit A' showing the number of tons sold by defendants to said parties, the prices obtained for same and the prices reported by defendants to plaintiff and the differences between the amounts defendants were entitled to receive and the amounts actually retained by them. That the amounts retained by defendants in excess of what they were entitled to retain aggregate $4,259.70, for which, with interest at six per cent per annum from commencement of this suit, plaintiff asks judgment.

"For a second cause of action said petition alleges that defendant unlawfully charged and kept back $2 a car on 263 cars, amounting to $526, on a claim that plaintiff did not ship cars of coal enough to enable defendants to fill orders for coal, and that said deductions were illegally retained by defendants out of plaintiff's money, the items being as follows: January 4, 1898, 38 cars at $2 a car, $76; January 8, 1898, 92 cars at $2 a car, $184; January 25, 1898, 53 cars, at $2 a car, $106; January 29, 1898, 80 cars at $2 a car, 160; and plaintiff asks for judgment under this count for $526 and interest on same from commencement of this suit.

"For a third cause of action said petition alleges that in the account, February, 1898, defendants illegally deducted $47.76 shortage on coal. That in the transaction of the business claims for shortage of coal were to be submitted to and approved by plaintiff before being allowed; that notwithstanding the protest of plaintiff defendant wrongfully retained said sum of $47.76 in said month and never repaid same to plaintiff. Judgment is asked for this sum and interest thereon since commencement of this suit.

"For a fourth cause of action said petition alleges that defendants for the months of September and October, November and December, 1898, wrongfully retained a commission of ten cents a ton on the coal sold by

them for plaintiff, whereas, by the terms of the agreement between plaintiff and defendants, they were to receive a commission of but five cents a ton for said coal sold by them during the said months; that said moneys so wrongfully retained during said months were as follows: September, 1898, $325.41; October, 1898, $426-.31; November, 1898, $462.50; December, 1898, $256.68; making an aggregate of $1,430.90 for which with interest from commencement of this suit plaintiff asks judgment.

"This petition concludes with a prayer for judgment for the aggregate of said four counts, viz.: $6,-254.36 with interest thereon for the commencement of suit. 'Exhibit A' filed with said second amended petition and referred to therein purports to show the sales made by defendants of the coal of plaintiff to thirty different customers, giving the number of tons sold to each with the dates of sale and the amounts received by defendants for the coal and the amounts remitted by defendants to plaintiff; the amount of authorized deductions and the difference between the amounts remitted and the amounts that ought to have been remitted. These differences aggregate $4,259.70, the amount claimed under the first count of said petition.

"The answer of defendant Edward McDermott, after denying all the allegations of the second amended petition, alleges that he and Charles McDermott as partners under the name of McDermott Bros. Coal Company on February 6, 1896, made a contract with plaintiff for the sale and handling of plaintiff's coal in St. Louis; that on May 1, 1896, this defendant bought the interest of his said partner and continued the business in the name of McDermott Coal Company; that on May 8, 1896, the said contract made with plaintiff was modified in these particulars; first, that plaintiff waived till January, 1902, the right which it had reserved to open a depot in the city of St. Louis for the sale of coal in wagon load lots; second, that plaintiff would not sell

or deliver at its mines near Springfield to any person but the McDermott Coal Company. And that on March 1, 1897, the said contract was again supplemented so as to extend the territory of defendant embraced in said contract. And that on September 27, 1897, another supplemental contract was entered into between plaintiff and this defendant, as the McDermott Coal Company, in which the contracts hereinbefore mentioned were all affirmed and ratified and the assignment of the same to said Edward McDermott acknowledged and ratified by plaintiff. And that on February 9, 1898, the business of Edward McDermott was incorporated in the name of McDermott Coal Company and defendant McDermott Coal Company became the owner of all the business and property of said company and became the owner and holder of all the supplemental contracts and succeeded to all the rights and privileges and claims existing under said contract and supplemental contracts and conducted said business with plaintiff and received and sold said coal and accounted to plaintiff for the proceeds thereof. Said answer further alleges that it was agreed between plaintiff and this defendant, on the sixteenth day of July, 1896, that there should be a departure from the several contracts between plaintiff and this defendant in this; that plaintiff should sell to the defendant coal at a price then and there agreed upon between plaintiff and defendant and that this defendant should take said coal at said prices and pay plaintiff therefor, and that in accordance with said agreement said coal so shipped by plaintiff to defendant up to the ninth day of February, 1898, was received and paid for by defendant under said agreement which was fully understood by plaintiff and defendant, and each of said transactions was so closed out by plaintiff and defendant, and include all the transactions set out in the bill of particulars or exhibit filed with plaintiff's petition up to February 9, 1898; that it was understood by plaintiff and defendant that defendant should have

for his compensation for the sale of said coal such profit as he would obtain over and above the price agreed upon and quoted from time to time from July 6, 1896, to February 9, 1898, and that plaintiff well knew this arrangement and method of doing business and settled each account in accordance therewith.

"This answer further alleges that defendant handled 182,000 tons of coal shipped by plaintiff to defendants and that plaintiff in its petition and exhibit thereto claims commission on 52,000 tons only of said coal. That in some instances this defendant and his codefendants received more than ten cents per ton profit on said 52,-000 tons, but that on all the remaining tons of coal so received and sold by defendants the profit was less than ten cents and in many instances said coal was sold at a loss; and if defendants desire to hold plaintiff to a strict and literal compliance of the contract then, in equity the whole amount of coal shipped by plaintiff to defendant and handled by them should be taken into account in determining whether or not defendants have received more than ten cents a ton on the coal so handled by them, and that when the profits are so computed this defendant and his codefendant have received less than ten cents a ton commission or profit. This answer refers to a statement 'Exhibit A' filed with answer of the other defendant.

"The answer of defendant McDermott Coal Company to the second amended petition alleges that this defendant is a corporation organized under the laws of the State of Missouri, admits that prior to its organization Edward McDermott was conducting the business set out in the petition under the name of McDermott Coal Company, but denies that the said business was conducted by said McDermott as the agent of plaintiff, denies that after the organization of said corporation said McDermott transacted said business under the name of McDermott Coal Company; but that after the organization of said corporation said business was

transacted by said corporation in the name of McDermott Coal Company, admits that plaintiff is the owner and operates coal mines near Springfield, Illinois, but denies that the business transacted between plaintiff and this defendant was done by this defendant or Edward McDermott as the agent of plaintiff. The answer then denies every allegation in the second amended petition except those above admitted or as may be hereinafter admitted. For a further answer and defense to said petition, said answer alleges that Edward McDermott entered into several contracts filed herein with plaintiff; that after the execution of said contract, viz.: on July 16, 1896, it was agreed between plaintiff and said McDermott that there should be a temporary departure from said contracts in this, that plaintiff should sell said coal to said McDermott at the price then agreed upon and that said McDermott should take said coal at said price and pay plaintiff therefor and that all the coal shipped by plaintiff to said McDermott thereafter up to February 9, 1898 was shipped in accordance with said agreement and was paid for by said McDermott, and each transaction was closed out in accordance with said agreement, and these transactions included every transaction mentioned in second amended petition and the exhibits therewith up to February 9, 1898. That on said February ninth this defendant was incorporated and all the business of said McDermott including said contracts became the property of this defendant and the same agreement as to shipment and payment for coal was continued after said date till the termination of the contract by plaintiff. And after February 9, 1898, this defendant received the coal so shipped by plaintiff and paid plaintiff all that was due by reason thereof; that it was understood and agreed between plaintiff and this defendant that this defendant should have as its compensation for the sale of said coal such profit, as it could obtain over the price agreed upon and quoted by plaintiff from time to time to this defendant.

For a further answer and defense said answer alleges this defendant and Edward McDermott disposed of 182,000 tons of coal shipped by plaintiff to said McDermott and this defendant and that plaintiff in its petition claims an excess of ten cents per ton on commission on 52,000 tons only of the coal sold by McDermott and this defendant; that in some instances said McDermott and this defendant received more than ten cents per ton profit on said 52,000 tons of coal, but that on all the coal so received and disposed of by defendants the profits were less than five cents per ton, and in many instances no profit was received; that if plaintiff is entitled to recover of defendants the excess of ten cents a ton on 52,000 tons the defendants should be credited with a sum that would make its profits ten cents a ton on said 182,000 tons; and that when the profits are so computed this defendant and said McDermott have received less than ten cents per ton commission or profit. And this defendant files a statement 'Exhibit A' showing the coal handled by it and said McDermott in 1896, 1897 and 1898 for which it received less than ten cents a ton showing a balance of $7,133.26.

"For a counterclaim this answer alleges that plaintiff, on the sixth of February, 1896, made a contract with McDermott Bros. Coal Company, a copartnership composed of Edward McDermott and Charles McDermott, by which plaintiff agreed to appoint them its exclusive agents and to give them the exclusive handling and disposition of plaintiff's coal in the city of St. Louis and certain other territory with one exception which related to Dennis Noonan; that on May 1, 1896, said Edward McDermott bought the interest of said Charles McDermott in said partnership and continued the business under the name of the McDermott Coal Company; that on October 8, 1896, said contract of February 6th was modified in this, that plaintiff waived the right to open a depot in St. Louis for the sale of coal in wagon load lots and plaintiff agreed that it would not

sell or deliver from its said mines to any other party but said McDermott Coal Company; that on March 1, 1897, said contract was supplemented so as to extend the territory of said McDermott Coal Company to St. Charles and certain other points, and citing the cancellation of the contract between plaintiff and said Noonan and giving to McDermott Coal Company all the territory theretofore reserved to said Noonan, and providing that the sale of coal in the additional territory should be controlled by the same prices, same terms of commission, and same mode of payment as in the said contract of February 6, 1896; that on September 28, 1897, another supplemental contract was made between plaintiff and said McDermott Coal Company in which said Edward McDermott was recognized as the assignee of all said contracts, and the duration of said original contract was extended to ten years from February 6, 1896, and providing that said original contract and supplemental contracts should be in force for ten years from February 6, 1896, except as to the rate of commission to be paid for the sale of said coal, which condition is set out in said contract of said September 28th; that on February 9, 1898, the defendant the McDermott Coal Company was incorporated and became the owner of the business and property of said McDermott employed in said business, and of said contract, and all rights and privileges under the same; that on November 3, 1898, a supplemental contract was entered into between plaintiff and this defendant which reaffirmed the said contracts and supplemental contracts, and which provided that plaintiff should ship 80 per cent of all the lump and egg coal output of the mines of plaintiff until said output should reach 420 tons of egg coal daily and then 60 per cent of said output, to this defendant, and which further provided that 'should it be found that at any time during the time of this paper's existence that said Citizen's Company has failed and neglected to ship the lump and egg coal as

above provided then the Citizens' Company agreed to pay to the McDermott Company a sum equal to twelve and one-half cents a ton between the difference of the amount actually shipped and the amount provided for above;' that about July 15, 1896, the provisions of said contract fixing the commission and compensation to be paid defendant for selling said coal was by agreement between plaintiff and defendant temporarily departed from and it was agreed that defendant should pay plaintiff a fixed price for its coal, to be made by plaintiff, and have as compensation for the sale of said coal such profits as defendant could obtain in excess of the price quoted by plaintiff, and said arrangement was in existence and being carried out at the time of the incorporation of this defendant and was entered into and continued by this defendant until October 3, 1898, when plaintiff and this defendant agreed that said business should be done. under the terms of said original contract and said supplemental contracts, and after last-named date this defendant handled and disposed of said coal in accordance with said contracts and charged the commission provided for in said contracts; that plaintiff failed and refused to ship any coal to this defendant after December 15, 1898, to defendant's loss and damage in the sum of $75,000 for which sum this defendant prays judgment; and that plaintiff failed and refused to ship 80 per cent of the output of its mines to defendant as per its agreement from November 3, 1898, up to December 15, 1898, to defendant's loss and damage in the sum of $1,500 for which amount this defendant prays judgment.

"For a second counterclaim this answer alleges that plaintiff failed and refused to ship to defendant, from February 9, 1898, to June 3, 1898, the amount of coal sold by defendant and contracted to be delivered to defendant's customers, as per plaintiff's agreement with defendant so to do, to defendant's loss and dam-

age in the sum of $3,500 for which defendants ask judgment.

"For a third counterclaim this answer alleges that plaintiff, from September 1, to November 14, 1898, knowingly and with intent to injure defendant's trade and business shipped to defendant dirty and un-screened coal not called for in the contracts between plaintiff and defendant in violation of its agreement, to defendant's loss and damage in the sum of $2,000.

"This answer concludes with a prayer for judgment against plaintiff for $82,000 and costs. With this answer was filed a statement marked 'defendant's Exhibit A' purporting to show the number of tons of coal sold to thirty-one different concerns and the prices for which it sold and the amount remitted to plaintiff therefor, the amount of the commission at ten cents a ton, and the amount of commissions actually received, and the balance due defendant.

"To the answer of each defendant, plaintiff filed a reply denying every allegation of new matter in said answer contained.

## "THE EVIDENCE.

"The evidence is very voluminous, covering 1,784 type-written pages and embracing about 470 exhibits. To even summarize it would make this report entirely too long, and I will confine myself to a statement of my findings of facts and the legal conclusions resulting therefrom.

"The most important question involved in the issues raised by the pleadings and to which much of the evidence was directed is, what relation did defendants sustain to plaintiff in the selling and handling of the coal shipped by plaintiff to defendants? Plaintiff alleges and contends that it shipped the coal to defendant Edward McDermott in the name of McDermott Coal Company, as its agent, to be sold by him as the agent of plaintiff and for the selling of which he was to be paid

a commission. Defendants allege and contend that from July 6, 1896, to October 3, 1898, plaintiff did not ship its coal to defendants or either of them as its agents, but that during that period defendants bought of plaintiff the coal shipped them by plaintiff at certain agreed prices and paid plaintiff therefor, and that defendants or either of them did not have to account to plaintiff for the moneys received by them for said coal. The period from July 16, 1896, to October 3, 1898, includes the whole time covered by plaintiff's petition except a few months.

"The first contract was between plaintiff and McDermott Bros. Coal Company, a partnership composed of defendant Edward McDermott and his brother. This contract was in writing and was made February 6, 1896. This contract in express terms appoints McDermott Bros. Coal Company the exclusive agents of plaintiff for the sale of its coal in Granite City and East St. Louis and agrees that they shall receive a commission of ten cents a ton for selling the same, to be deducted by them from the money received by them for the coal. About May 1, 1896, defendant Edward McDermott bought his partner's interest in the firm of McDermott Bros. Coal Company and thereafter carried on the business in the name of the McDermott Coal Company.

"Defendants claim that about the sixteenth of July, 1896, a verbal agreement was made between plaintiff and Edward McDermott, then doing business in the name of the McDermott Coal Company, by which the said contract of February 6, 1896, was changed and modified so that instead of plaintiff shipping its coal to said McDermott as agent to be sold on commission, said McDermott was to buy the coal from plaintiff at a certain fixed price and his compensation for selling and handling it should be what he could receive for it in excess of the price he paid plaintiff. And defendants contend that this verbal agreement remained in force between plaintiff and said McDermott till February 9,

1898, when the McDermott Coal Company was incorporated, and then it was continued in force between plaintiff and said defendant corporation till October 3, 1898, when plaintiff and said defendant corporation mutually agreed that in the future the business should be conducted according to the terms of said original contract and written contracts supplemental thereto. Defendant Edward McDermott testified to the making of this verbal agreement and that thereafter the business was conducted in accordance therewith till October 3, 1898. Mr. Hann, who mainly managed the business of plaintiff, testified that no such agreement was made and that plaintiff never sold any coal to defendants or either of them, but on the contrary always shipped the coal to be sold for it on commission. In the written agreement made on March 1, 1897 (Exhibit 3), by which additional territory was given McDermott, it was stated that McDermott (party of the second part) agreed to sell the first party's coal in the new territory on the same terms of commission, sale and payment as provided in said contract of February 6, 1896. In the written agreement made on the twenty-ninth of September, 1897 (Exhibit 4), by which the duration of the original agreement was extended to 1906, the rate of commission was charged from and after February 6, 1901 (the termination of the original agreement), but it was expressly provided that up to February 6, 1901, the commission of second party (McDermott) should be as provided in said contract of February 6, 1896. And in his letter of April 15, 1897 (Ex. 119), McDermott says to plaintiff that he simply acts as his agent in selling its coal in this market. And in his letter of August 30, 1898 (Ex. 119), McDermott writes plaintiff that he will not put up a loss for it on commission. There are other writings in which McDermott used the words 'commissions' in speaking of handling this coal. In his testimony before me he said that he used the word 'commission' as meaning profit. There were facts

shown by the evidence which would be consistent with either theory. But in my opinion the weight of the evidence is decidedly in favor of plaintiff on this issue, and I find that all the coal shipped by plaintiff to McDermott Coal Company during the period covered in second amended petition, viz.: from and after July, 1896, till the end of 1898, was shipped by plaintiff to Edward McDermott, under the name of McDermott Coal Company, as the agent of plaintiff, to be sold for and on account of plaintiff, and for the selling of which said McDermott was to receive a commission of so much per ton to be deducted by him out of the price for which he sold the said coal. And I further find that said McDermott received and sold said coal as the agent of plaintiff under a contract and agreement with plaintiff to be paid a commission of so much per ton for the selling of said coal, to be deducted by said McDermott from the money received by him for the coal.

"Defendants, for special defense to plaintiff's cause of action, plead that if defendants are to be held to have handled this coal as agents for plaintiff to be compensated by a commission of so much a ton, then defendants should be allowed ten cents a ton on all the coal sold by them for plaintiff, and while it is true that in some cases defendants received more than ten cents a ton profit on said coal, yet when the whole amount of coal shipped by plaintiff and handled by defendants and the whole amount of profit or commissions received by defendants are taken into consideration, said Edward McDermott and his codefendant have received less than ten cents a ton commission or profit on the whole amount of coal so handled by them for plaintiff. And defendants filed with their answers a statement (defendants' Exhibit A) purporting to show the coal handled by them and for which they received less than ten cents a ton profit or commission. This special defense, as set out in the respective answers of defendants, alleges what in substance amounts to this; that the ag-

gregate of the sums retained by defendants as commissions for selling the whole of the coal shipped them by plaintiff is less than ten cents a ton on the whole amount of the coal so handled. The evidence failed to prove the facts alleged in this special defense.

"Defendants did not show or produce evidence to prove the prices received by them for all the coal shipped them by plaintiff and sold by them. They did not even attempt to do this. They offered evidence tending to prove that as to certain quantities of coal sold to certain parties they retained less than ten cents a ton for selling or handling the same. But the evidence disclosed large quantities of coal shipped to them by plaintiff and sold by them, and in regard to the prices received for same by defendants, no evidence whatever was offered. So under the evidence, I find the issues of fact raised by this special defense in favor of plaintiff. And even if the answers of defendants did not require them in order to establish this special defense to prove the prices at which all said coal was sold, in order to show that, on the whole, defendants had not retained more than they were entitled to, fair dealing would seem to require this of them. When it has been shown that, in many instances, defendants did not make correct reports of the prices received by them for the coal, and by means of these false reports retained more out of the money received for the coal than they were entitled to, and defendants undertake to escape liability for the money so unlawfully retained by showing that the aggregate of the sums retained by them does not exceed the aggregate amount they were entitled to retain when the whole amount of the coal sold by them is considered, I think they should be required to make an exhibit of all the coal they sold for plaintiff and of the prices received for same. The books and accounts which defendants, as agents for plaintiff, should have kept would render this an easy thing to do. But one essential book is missing entirely and a part of another very

important book is torn out and missing, and no satis-
factory explanation is made of the absence of this one
whole book and the part of the other. In the absence of
these books it is practically impossible for plaintiff to
show what defendants received for a greater part of
the coal sold by them as plaintiff's agents.

"Again, the evidence shows that plaintiff made
known to Mr. McDermott from time to time during the
entire period of their dealings, in fact it seems to have
been an almost continual subject of correspondence and
conversation, that plaintiff would not ship the coal or
authorize a sale of same at any price that it would not
net plaintiff a certain sum per ton. In order for Mc-
Dermott to get ten cents a ton for commission he had
to sell the coal at ten cents a ton higher than this net
sum insisted on by plaintiff. If he could not find a mar-
ket at so high a price he was forced to the alternative
of making no sales or of making sales and receiving for
commission less than ten cents a ton. If under these
circumstances he saw fit to receive less than ten cents
a ton he probably had the right to do so, certainly he
can not be heard to complain. As the prices reported
to plaintiff were not the actual prices received for the
coal but were supposed to be the selling prices less com-
missions, the plaintiff had no means of knowing what
commission McDermott retained, except that they knew
he was not authorized to retain over ten cents a ton.
I do not find that there was an actual agreement between
plaintiff and McDermott that he should receive less
than ten cents a ton commission in any case except in
the case of the coal sold to the Nelson Morris Packing
Company. In that case plaintiff claims that there was
an agreement that McDermott should receive only two
and one-half cents a ton for commissions and, based
on that claim, asks to recover $266.69 on account of
money retained by McDermott on account of commis-
sions in excess of two and one-half cents. I find against

plaintiff on this claim for the reason that, while the evidence satisfies me that there was an agreement that McDermott should receive for the sale of that coal a very low commission, much less than ten cents a ton, I do not think the evidence warrants a finding that the commission should be two and one-half cents a ton. This coal was very low grade and in order to make a sale of it the price had to be made very low, and the evidence shows that there was an agreement that McDermott's commission for sale of this coal should be very low. As the commission retained by him was low, much less than ten cents a ton, I do not think the evidence shows that he retained as commission for sale of this coal anything in excess of what it was agreed he should retain and on the other hand, I find that he retained out of the sales of this coal for his commissions all he was entitled to retain under this agreement to receive a very low commission on the sales of this coal.

"If, under the circumstances indicated above, McDermott, in order to make sales, voluntarily reduced his commissions, and especially if he did so without knowledge of plaintiff, and led plaintiff to believe that he had sold the coal for enough to enable him to retain ten cents a ton commission and pay over to them the price reported (being the selling price less commissions) it would be manifestly unjust to allow Mr. McDermott to go back now and charge up against plaintiff the difference between what he actually charged at the time as and for commissions and the ten cents a ton which he would have been entitled to if he had sold the coal for enough to enable him to retain it and also pay over to plaintiff the net price which it insisted upon. This would be compelling plaintiff to sell its coal for a less price than it ever agreed to do and for a less price than it ever authorized defendants or either of them to sell it for. As I have previously stated, under the evidence, I find the issues of fact raised by this special defense

Coal Mining Co. v. McDermott.

in favor of plaintiff. And from no point of view can I see any merit in this special defense.

"Proceeding, then, to consider the evidence in relation to the allegations in plaintiff's second amended petition, that defendants in certain instances referred to in said petition and set out in detail in 'Exhibit A' filed therewith and referred to therein, received a higher price for the coal than they reported to plaintiff, and that they retained out of the proceeds of such sales more than they were lawfully entitled to retain, and I find that in the sales of the coal of plaintiff made by defendant McDermott in the name of the McDermott Coal Company, and specified in 'Exhibit A' filed with and referred to in second amended petition to the persons named below, said McDermott reported to plaintiff the prices received for said coal at less than the price actually received by him, and the amounts received by said McDermott for said coal from the following named persons respectively in excess of what he reported to plaintiff and retained by him in excess of what he was lawfully entitled to retain are as follows:

"Markle Lead Works ...................$   10.00
    Richard & Belding ...................     271.80
    John Eichorn ........................     128.83
    Crowson Coal Company ................     391.31
    E. Hilker ...........................     146.97
    Snelling Bros. ......................     262.43
    M. F. McGrath .......................      58.06
    Provident Chemical Company ..........     741.23
    C. A. Parrott .......................      85.17
    Louis Burkhart ......................     179.27
    George DeHoog .......................     153.34
    George LaRue ........................     114.65
    Turley Clipper Coal Company..........      82.15
    Willis Coal Company .................       8.23
    J. E. Kessler .......................       2.70
    St. Joseph College ..................       3.00
    C. E. Miller ........................       4.70

| | |
|---|---|
| W. J. Appling | 59.33 |
| St. Charles Car Company | 5.25 |
| C. M. Chase | 9.70 |
| Deeman Fuel Company | 42.10 |
| Wolf Milling Company | 20.36 |
| Hydraulic Pressed Brick Company | 100.19 |
| Progress Brick Company | 41.05 |
| H. M. Smith | 56.71 |
| Vandeventer Coal Company | 15.52 |
| | $2,994.05 |

"These sums aggregate the amount of $2,994.05, for which sum, with interest thereon from commencement of this suit, I find plaintiff is entitled to receive of defendant Edward McDermott.

"In regard to the second count or cause of action set out in said second amended petition, I find that defendant McDermott deducted from the price of the coal of plaintiff sold by said McDermott in January, 1898, the sum of $526 on account of loss he sustained by the failure of plaintiff to furnish or deliver 263 cars of coal which said McDermott had sold. This sum was charged in four items, one of January 4th, for $76, one of January 8th, for $184, one of January 25th, for $106, and one of January 29th, for $160. Plaintiff denied the right of said McDermott to retain these sums and the matter remained in dispute till plaintiff stopped shipping coal in December, 1898. The correspondence preceding January 8th and the statments, 'Exhibits 188 and 198,' together with the testimony of Mr. McDermott, satisfy me that plaintiff failed to ship the 38 cars and the 92 cars of coal charged under dates of January 4th, and January 8th, and that said McDermott had sold said cars, and that his loss on account of said failure was two dollars a car or $260 and I so find. But I find no sufficient evidence that said McDermott had sold or that plaintiff failed to ship the 53 cars charged under date of January 25th or the 80 cars charged under date

of January 28th, and I find the said McDermott had no right to retain any money on account of these 133 cars, and I find in favor of plaintiff on this second count and assess his damages in the sum of $266.

"The third cause of action contained in said second amended petition relates to $47.76 which plaintiff alleges was wrongfully retained by defendants out of the sales in February, 1898, on account of shortage in coal. I find that this item was embraced in the sum of $344.12 credited to McDermott Coal Company on page 285 of plaintiff's ledger 3 and also in the statement dated May 10, 1898, 'Exhibit D 130.' I find in favor of defendants on this count or cause of action.

"The fourth and last count or cause of action stated in said second amended petition relates to the question of defendants' commissions in the months of September, October, November and December, 1898. Defendants did retain out of the proceeds of the sales of plaintiff's coal in these months a commission of ten cents per ton. Plaintiff alleges in this count and claimed on the hearing that there was a verbal agreement with defendant McDermott to the effect that the commission during these months was only five cents per ton. Defendants deny that any such agreement was entered into. The evidence does not satisfy me that there was a positive agreement between plaintiff and Mr. McDermott that he would charge but five cents per ton commission after August, 1898. The subject was talked over in Springfield in April, 1898, but it seems not to have been settled then, for in May it was talked over again in St. Louis, and it was then agreed to let the business go on as it had till Mr. McDermott should return after the summer, when the subject would be taken up again. Mr. McDermott returned in August, but there does not appear to have been anything more said on the subject till after Mr. McDermott made his report of sales for September. In making this report McDermott charged only five cents a ton commission, but attached

to this reduction a condition which plaintiff said it was impossible to comply with, and then McDermott charged back against plaintiff the five cents a ton to which he was not charged for the coal sold in September. And the letter of plaintiff, written by Mr. Hann, of October 13, 1898, 'Exhibit 105' in answer to the letter of McDermott dated October 12th, 'Exhibit 104,' is not such a letter as would be natural if there had been a positive agreement to charge only five cents a ton commission. And the contract of September 29th, 1897, 'Exhibit 4,' specifically states that until February 6, 1901, the commission shall be as provided in the original contract of February 6, 1896, and as we have seen this original contract fixed the commission of McDermott at ten cents a ton. On this cause of action I find the issues in favor of defendants.

## "COUNTERCLAIMS.

"In its answer to second amended petition, defendant McDermott Coal Company set up three counterclaims under distinct heads.

"First counterclaim. The first consists of two claims or items, but being based on separate contracts they really constitute distinct counterclaims. In regard to the first claim which is for $75,000 damages for breach of contract on part of plaintiff in refusing to ship any more coal to this defendant after December 15, 1898, I find the issues in favor of plaintiff. I find, under the evidence, that plaintiff was justified in terminating the contract and in refusing to ship any more coal to McDermott or the McDermott Coal Company. While the evidence shows that plaintiff, on December 15, 1898, when it stopped shipping coal, did not have actual knowledge or positive information that this defendant or McDermott had made false returns as to prices received for coal, yet the evidence shows that it suspected that there was something wrong, and that McDermott was not acting fairly or honestly with it,

and it demanded of McDermott that he make his monthly returns of sales on a form sent him by plaintiff which would enable it to verify the correctness of such returns. Mr. McDermott peremptorily refused to adopt or consider this new form of return, and plaintiff refused to ship any more coal. Soon after, plaintiff obtained positive evidence of the most substantial character that this defendant and Mr. McDermott in their monthly returns of sales to plaintiff were in the habit of reporting some of the sales at a less price than that actually received and retaining more than they were entitled to on account of commissions. And at the hearing before me, it was clearly proven that in many instances defendants did in these monthly returns of sales report the selling price at less than the actual price and did retain on account of commissions more than they were entitled to retain. And after October 3, 1898, when defendants say they returned to the terms of the original contract and charged ten cents a ton commission, the book of defendants themselves, from which they made their returns to plaintiff, when compared with the original bills made out by them to their customers, shows that they entered in this book the selling price at less than the actual prices received and deducted from the proceeds of such sales not only ten cents a ton commission but also the difference between the amount actually received for the coal and the amount entered in their book and reported to plaintiff as the price received for the coal. Instances of this kind will be found by comparing the original bills for October and November, 1898, produced by Mitchell Clay Company, Turley Clepper Ice and Coal Company and George DeHoog with defendants' sales book (Ex. D 208) for those months.

"The second item or claim in the first counterclaim is for $1,500 damage for breach of contract on part of plaintiff in failing to ship defendant 80 per cent of the output of its mines of lump and egg coal from November 3, 1898 (the date of this contract), to the fifteenth

of December, 1898. In their brief given to me defendants' counsel claim that the evidence shows that from the third to the last of November defendants received 734.33 tons less than 80 per cent and that from the first to the fifteenth of December defendants received 36.44 tons less than said 80 per cent. And they compute the damages at twelve and one-half cents a ton (being the basis fixed in this contract) making $96.33. This is based on the testimony of Mr. McDermott and on 'Exhibit D 307' prepared by and put in evidence by him. I find that the evidence sustains this claim. And I find the issues on this counterclaim against the plaintiff and assess the damages at $96.33.

"Second counterclaim. The second counterclaim is for $3,500 for damages for breach of contract on part of plaintiff in failing to ship defendants from February 9th to December 3, 1898, the amount of coal sold by defendants and contracted to be delivered to defendants' customers. On this counterclaim I find the issues in favor of plaintiff.

"Third counterclaim. The third counterclaim is for $2,000 damages based on the allegations that plaintiff from September 1st to December 14, 1898, purposely and with intent to injure defendant's trade shipped to defendants dirty coal not called for in the contracts. On this counterclaim I find the issues in favor of the plaintiff.

"It is alleged in the answers to the second amended petition and shown by the evidence that defendant, the McDermott Coal Company was incorporated in February, 1898, but defendant Edward McDermott had carried on the business from the summer of 1897 in the name of the McDermott Coal Company, the same name that was given the corporation. And the evidence does not show that plaintiff knew of the incorporation of this company. It is true that the contract of November 3, 1898, was signed 'McDermott Coal Company, by Edward McDermott, president; H. C. Trier, vice president.' But

McDermott had been in the habit of signing 'McDermott Coal Company, by Edward McDermott.' And the evidence shows that Mr. McDermott controlled and managed the business after the creation of the corporation as fully and in the same manner as he did before. There was nothing to indicate any change of ownership, and, as a matter of fact, there was no change in the management of the business. It was always managed by Edward McDermott. McDermott never notified plaintiff that he was no longer its agent to sell its coal, or that he was no longer personally responsible to it for the coal shipped to McDermott Coal Company. The books of plaintiff put in evidence show that the accounts with McDermott Coal Company which had been opened long before the incorporation of this company were continued without a break and without any entry to indicate any change of persons or change whatever. The contracts that McDermott had with plaintiff were not assignable without its consent. The position of agent and consignee of goods to be sold and accounted for is a confidential one, involving confidence in the agent's capacity and integrity as well as financial ability. A person might be willing to enter into a contractual relation of that kind with one person, but entirely unwilling as to another person. So that McDermott could not, by attempting to transfer or assign the contracts he had with plaintiff, substitute another person in his place and constitute such person the agent or consignee of plaintiff.

"Besides, I find from the evidence that this corporation was formed by Edward McDermott to be used and controlled by him for his own convenience, and that, in substance, it was nothing but Edward McDermott. The book put in evidence marked by the referee 'Defendants' Exhibit, Journal 1898,' shows that this corporation was based and founded on the business which McDermott was carrying on, and very largely on the contracts that he had with plaintiff. On page 3 of this journal is a statement of the assets and liabilities which

were considered when this company was incorporated. The contracts with plaintiff are put in as an asset worth $14,000. The surplus of assets over liabilities is stated to be $20,000, and this was what was used to pay for the capital stock, which was issued as follows: to Edward McDermott $11,900, to M. R. McDermott (his wife) $8,000, and H. C. Trier $100. Mr. McDermott testified that he gave this stock to Trier. On page 2 of this journal is an assignment by McDermott to the corporation of the assets and liabilities of the McDermott Coal Company (Edw. McDermott) including the contracts with plaintiff. On page 4 of this book are the minutes of a meeting of directors in which McDermott and his wife are the only ones present and at which Mr. Mc. Dermott was elected president and general manager and his wife secretary and treasurer. On page 34 of this book are the minutes of a meeting held December 27, 1898, at which the old officers resigned and new ones were elected. Mr. McDermott testified that this was done on the advice of his counsel after he got into trouble with plaintiff. On page 42 of this book are the minutes of a meeting held February 4, 1899, at which a resolution was adopted reciting that the company owed McDermott $4,780 advanced by him to pay the debts of the company and authorizing him to draw from the company said sum of $4,780, and all moneys in the treasury of the company, and all moneys due it be assigned to said Edward McDermott. The body of the minutes of these meetings appears to be in the handwriting of Edward McDermott. The books put in evidence which McDermott had in use in his business before the corporation, were continued after the incorporation, and the accounts therein, including the accounts of plaintiff, were continued without interruption and without any entry whatever showing any change in the parties to the accounts. The testimony of Mr. McDermott is to the effect that this corporation ceased to do business soon after plaintiff ceased to ship coal to the Mc-

Dermott Coal Company, and that it has not resumed business since. Under the facts and circumstances shown by the evidence I am of opinion that defendant Edward McDermott is liable to account to plaintiff for all the coal shipped by plaintiff to McDermott Coal Company. And I am of opinion that the separate answer filed by the defendant for the McDermott Coal Company should be regarded and treated as a further or additional answer of Edward McDermott, and the sum of $96.33 found in favor of defendants under the first counterclaim should be adjudged to Edward Mc. Dermott and allowed him as a credit or set-off against the sums hereinbefore found in favor of plaintiff. Defendant, the McDermott Coal Company, can not complain of this, because, in the first place, while no account is stated of the amount due plaintiff on account of sales of coal after Feburary 3, 1898, the date of the incorporation, the evidence shows that it exceeds $96.33, so that if the defendant corporation should be held liable to account to plaintiff for all coal sold after February 3, 1898, it would be found to be indebted to plaintiff, after receiving credit for these $96.33. And again, the evidence indicates that when it was incorporated it assumed all the indebtedness and liability of Edward Mc-Dermott to plaintiff growing out of this business which would make this corporation liable for the entire sum found due from McDermott to plaintiff. Plaintiff can not complain of this disposition of these $96.33 because it never gave credit to this corporation, but shipped coal relying on the liability and responsibility of Edward McDermott. Deducting these $96.33 from the sum of $3,260.05, hereinbefore found in favor of plaintiff, leaves the net sum of $3,163.72 in favor of plaintiff.

"I recommend that a judgment be entered dismissing plaintiff's second amended petition as against defendant, the McDermott Coal Company, and in favor of plaintiff and against defendant Edward McDermott for

$3,163.72 and interest on same at rate of six per cent per annum from February 7, 1899, and for costs.''

In due time after the report was filed, defendant filed exceptions thereto which were overruled by the court. The report of the referee was approved and judgment entered according to the referee's findings. Motion to set aside the report and for a new trial was filed by the defendant and overruled by the court, whereupon the defendant appealed.

The issues raised by the pleadings required the examination of a long account and the cause was properly referred under section 698, Revised Statutes 1899, and no objections were made to the order of reference by either party; when this is the case, the finding of facts by the referee stands as the verdict of a jury, the case being one at law. [Tufts v. Latshaw, 172 Mo. 359, 72 S. W. 679; Bank v. Donnell, 172 Mo. 384, 72 S. W. 925; Snoqualmi Realty Co. v. Moynihan, 78 S. W. 1014.] The finding of facts by the learned referee is supported by substantial evidence, as appears from the abstract of the evidence furnished us by appellant. If the facts are correctly found then there are no controverted legal questions in the case and the judgment is for the right party and for the correct amount. As we cannot review the evidence, there is nothing left for us to do but affirm the judgment. The judgment is affirmed. All concur.